**NELL JEAN INDUSTRIES, INC., Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner of Social Security, Defendant,**

and

**Michael Holland, et al., Trustees of the UMWA Combined Benefit Fund, Defendants–Intervenors**

No. CIV.A.01–2006 (ESH).

United States District Court, District of Columbia.

Sept. 10, 2002.

---

19. An Order consistent with the Court's ruling accompanies this Memorandum Opinion.

John R. Woodrum, W. Gregory Mott, Heenan, Althen & Roles, Washington, DC, for Plaintiff.

Anne M. Joseph, U.S. Dept. of Justice, Federal Prorams Branch, Washinton, DC, Brian G. Kennedy, U.S. Dept. of Justice Civil Div., Washington, DC, for Larry G. Massanari, Jo Anne Barnhart.

Peter Buscemi, Morgan, Lewis & Bockius, L.L.P., Washington, DC, Elizabeth A. Saindon, Mooney, Green, Gleason, Baker, Gibson & Saindon, Washington, DC, for Trustees of United Mine Workers of America Combined Benefit Fund.

## MEMORANDUM OPINION

HUVELLE, District Judge.

At issue here is the Commissioner of Social Security's decision requiring plaintiff to pay the health insurance premiums of retired coal miners and their dependents. Plaintiff was assigned this liability pursuant to the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act"), 26 U.S.C. §§ 9701–9722. The Trustees of the United Mine Workers of America Combined Fund (the "Trustees") were granted leave to intervene as defendants, for the Combined Fund has the statutory responsibility to collect health care premiums from assigned coal operators and to use the premiums to provide health coverage to its beneficiaries.[1] At the parties' request, the Court directed them to file briefs addressing only Counts I and III of the First Amended Complaint.[2]

1. The Trustees also filed a counterclaim for a declaratory judgment that (1) the Coal Act does not violate the Due Process or Takings Clause of the Fifth Amendment as applied to Nell Jean and (2) the beneficiary assignments made to Nell Jean are valid under the Act. While Trustees do not argue in support of

their counterclaims, the first counterclaim is necessarily decided in their favor as a result of this Opinion. The second counterclaim implicates Count II and cannot be fully addressed at this time. *See infra* note 2.

2. Count II challenges the assignment of certain beneficiaries on the basis that they were

In Count I plaintiff seeks an order directing the Commissioner of the Social Security Administration (the "Commissioner" or "SSA") to void plaintiff's assignment of liability for health insurance premiums as violative of the Takings and Due Process Clauses of the Fifth Amendment under the Supreme Court's decision in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), and section 706(2)(A) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). Plaintiff claims that the Coal Act, as applied to it, is unconstitutional because plaintiff is substantially identical to the plaintiff in *Eastern Enterprises*. As a result of these factual similarities, plaintiff also claims that the Commissioner's refusal to void plaintiff's Combined Fund beneficiary assignments, after voiding assignments made to other companies similarly situated to Eastern, is arbitrary and capricious.

In Count III, plaintiff challenges the Commissioner's September 1999 assignment of Tuness Tiller and his dependents to plaintiff after the Commissioner voided his initial assignment in response to the Supreme Court's decision in *Eastern Enterprises*. Plaintiff seeks an order requiring the Commissioner to vacate this assignment of a former "Eastern beneficiary" [3] as a violation of the assignment criteria in section 9706 of the Coal Act

and an abuse of discretion under sections 702 and 706 of the APA.[4]

All parties have moved for partial summary judgment, and the only questions to be resolved are issues of law. As explained more fully below, the Court concludes that plaintiff is not substantially similar to Eastern, and thus, its challenge to Count I must fail. The Court also finds that Commissioner's assignment of an additional beneficiary to plaintiff following the Supreme Court's decision in *Eastern Enterprises* was both consistent with the Coal Act and a reasonable exercise of discretion under the APA. Therefore, summary judgment is appropriate as to Counts I and III.

## BACKGROUND

The coal industry's attempts over the last century to provide benefits to coal miners, culminating in the passage in 1992 of the Coal Act, are well documented in numerous court decisions, including the Supreme Court's decision in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), and therefore, only a short summary of the background and statutory provisions relevant to this case will be presented here.

## I. History of the Coal Act

Since 1942, health benefits for retired coal miners have been provided through a

---

assigned to plaintiff after the October 1, 1993 statutory cut-off date set forth in section 9706(a) of the Coal Act. Pursuant to the agreement of the parties, further proceedings on this count have been held in abeyance pending the Supreme Court's ruling in *Barnhart v. Peabody Coal* (No. 01–705) and *Holland v. Bellaire Corp.* (No. 01–715). *See* Court's Order dated March 12, 2002. As a result of this Order, the Court will not address defendant's argument that plaintiff is barred by the statute of limitations from challenging assignments made before September 21, 1995.

**3.** An "Eastern beneficiary" refers to a Combined Fund beneficiary whom the SSA initially assigned to Eastern or a similarly-situated operator pursuant to § 9706(a)(3) and whose assignment was declared void by SSA after the *Eastern Enterprises* decision.

**4.** In its First Amended Complaint, plaintiff added Counts IV and V against the Trustees seeking a refund or credit for premiums improperly paid pursuant to Counts I–III. Since these Counts implicate Count II, they cannot be resolved at this time. *See supra* note 2.

series of multiemployer health plans established under collective bargaining agreements known as National Bituminous Coal Wage Agreements ("NBCWAs" or "coal wage agreements"). From 1950 through 1974, health benefits provided under the coal wage agreements were financed by the United Mine Workers of American ("UMWA") 1950 Welfare and Retirement Fund, a multiemployer trust fund. Coal operators paid royalties into this fund on the basis of the amount of coal mined or the number of covered hours worked under a particular collective bargaining agreement. The agreements did not specify benefits to which miners and their families were entitled. Instead, benefits were determined by trustees of the fund based on their discretion and the financial soundness of the fund.

Then, to comply with the funding and vesting requirements of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, the UMWA entered into the 1974 coal wage agreement with the Bituminous Coal Operators Association ("BCOA"), a multiemployer bargaining association created in 1951 to be the primary representative of coal operators in their negotiations with the UMWA. *Eastern Enterprises*, 524 U.S. at 509, 118 S.Ct. 2131. The 1974 coal wage agreement divided the UMWA 1950 Welfare and Retirement Fund into four plans. Two of these plans covered retiree health benefits: the 1950 Benefit Plan provided health benefits to coal workers who retired before 1976, and the 1974 Benefit Plan covered those who retired on or after January 1, 1976. The 1974 coal wage agreement expressly provided lifetime health benefits to retirees and their dependents for the first time. *Id.* at 509, 118 S.Ct. 2131.

The 1950 and 1974 Benefit Plans experienced financial difficulties due to the liberalization of benefits under the 1974 coal wage agreement, demographic and economic changes that included a decline in coal production (and the resulting decline in contributions to the funds), the retirement of a generation of miners, and escalating health care costs. In response to the financial problems faced by the multiemployer plans, the 1978 coal wage agreement required signatory employers to establish individual employer health plans to provide benefits to their active employees and retirees. Under the 1978 agreement, the 1974 Benefit Plan, a multiemployer plan, was restricted to cover only those "orphaned" miners who retired on or after January 1, 1976 and whose former employer had gone out of business. The 1950 Benefit Plan continued to provide health benefits to miners who retired before 1976.

Despite the changes imposed by the 1978 coal wage agreement, increasing costs and the withdrawal of employers from the 1978 coal wage agreement led to a continuing decline in the financial situation of the plans. In response, the Secretary of Labor's Advisory Commission on United Mine Workers of America Retiree Health Benefits (the "Coal Commission") was created in 1989 to address the funding problems of the retiree health benefits plans. Two years after the Commission released their report and recommendations, Congress enacted the Coal Act.

## II. The Coal Act

In the Coal Act, Congress aimed to "stabilize health plan funding" and provide health care benefits to retirees by identifying those most responsible for the liabilities of the 1950 and 1974 Benefit Plans. *Eastern Enterprises*, 524 U.S. at 514, 118 S.Ct. 2131. The Act combined the two plans to create a new multiemployer plan called the United Mine Workers of America Combined Benefit Fund ("Combined

Fund"). "The Combined Fund provides substantially the same health benefits to retirees and their dependants" as the 1950 and 1974 Benefit Plans. *Id.* at 514, 118 S.Ct. 2131. It is financed by annual premiums assessed against coal operators that signed any coal wage or other agreement requiring the operator to contribute to the 1950 or 1974 Benefit Plans. These operators are "signatory operators" under the Act. 26 U.S.C. § 9701(b)(1), (b)(3), (c)(1). Any signatory operator who "conducts or derives revenue from any business activity, whether or not in the coal industry," may be liable for the premiums. §§ 9701(c)(7), 9706(a). Liability for health care premiums for eligible coal miners is assigned to a signatory operator or its related person according to statutory criteria. § 9706(a).

The Coal Act directs the SSA Commissioner to "before October 1, 1993, assign each coal industry retiree who is an eligible beneficiary to a signatory operator which (or any related person with respect to which) remains in business" in the following order:

(1) First, to the signatory operator which -

(A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry for at least 2 years.

(2) Second, if the retiree is not assigned under paragraph (1), to the signatory operator which -

(A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry.

(3) Third, if the retiree is not assigned under paragraph (1) or (2), to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement.

§ 9706(a)(1)-(3).

Assigned signatory operators pay a health care premium to the Combined Fund for each of their assigned beneficiaries. § 9407(a). Where a signatory operator is no longer involved in any business activity, premiums may be assessed against a "related person," including members of the same controlled group of corporations, businesses or corporations under common control, any person in partnership or joint venture with a signatory operator, and any of their successors in interest. *Eastern Enterprises,* 524 U.S. at 498, 118 S.Ct. 2131; *see* §§ 9706(a), 9701(c)(2)(A). The definition of a "controlled group of corporations" is borrowed from section 52(a) of the Internal Revenue Code, which provides that "all employees of all corporations which are members of the same controlled group of corporations shall be treated as employed by a single employer." [5] 26 U.S.C. § 52(a). Related person status is determined as of July 20, 1992. § 9701(c)(2)(B). In addition to related person or controlled group liability for retirees health care premiums, the Coal Act explicitly makes "[a]ny related person with respect to an assigned operator ... jointly and severally liable for any premium re-

---

5. In addition, § 52(a) defines a "controlled group of corporations" to include, *inter alia,* parent-subsidiary groups, where the parent owns more than 50 percent of the total voting power of all classes of stock in the subsidiary or where the parent owns more than 50 percent of the total value of shares of all classes of stock in the subsidiary. 26 U.S.C. §§ 52(a), 1563(a).

quired to be paid by such operator." § 9704(a).

Eligible beneficiaries whose former employers no longer exist and who could not be assigned to any signatory operator or related company under the criteria set forth in § 9706 receive benefits from a pool of reserved funds transferred by Congress from the 1950 Benefit Plan and the Abandoned Mine Reclamation Fund established under the Surface Mining Control and Reclamation Act of 1977 to the Combined Fund (see 26 U.S.C. § 9705(a), (b); 30 U.S.C. § 1232(h)) or, if necessary, from premiums assessed proportionately against all assigned operators. 26 U.S.C. § 9704(a)(3), (d). To date, it has been unnecessary to assess any such premiums.

### III.  Nell Jean Coal Company

Nell Jean Coal Company, the predecessor to plaintiff Nell Jean Industries, mined bituminous coal in West Virginia from 1955 to 1963 and from 1966 to 1967 using an hourly work force organized by the UMWA. It was a signatory to a succession of collective bargaining coal wage agreements negotiated with the UMWA during those time periods. (Hylton Aff. ¶¶ 3–4.) Plaintiff stopped its coal mining operations sometime in 1967 and shifted to the commercial construction business at that time. (Hylton Aff. ¶ 5.) Plaintiff has remained in business at all times. (Hylton Aff. ¶ 6.)

As of July 20, 1992, plaintiff is a "related person," within the meaning of section 9701(c)(2) of the Coal Act, to Perry & Hylton Inc. ("P & H"), another coal company. (Tennille Decl. ¶ 12.) P & H was signatory to coal wage agreements from 1963 through January 1, 1988, including the 1974 and 1978 NBCWAs, as well as successor agreements in 1981 and 1984. (Tennille Decl. ¶ 13.) P & H ceased coal mining operations shortly after that time but remains in business for the purposes of section 9701(c)(7) of the Coal Act. (Hylton Aff. ¶ 13.)

After the Coal Act was enacted, the Commissioner of Social Security assigned Nell Jean responsibility for the health care premiums for a number of retired miners who had worked for Nell Jean during the period that it was signatory to a UMWA wage agreement. (Hylton Aff. ¶ 7; Tennille Decl. ¶ 8). In the fall of 1998, after the Supreme Court's ruling in *Eastern Enterprises*, Eastern and other similarly-situated operators that had not signed a 1974 or later coal wage agreement and were not statutorily related to a company that had signed such an agreement were relieved of their Combined Fund beneficiary assignments because of the Supreme Court's holding that these assignments were unconstitutional.

In September 2000, plaintiff requested that the Commissioner withdraw plaintiff's assignments, asserting that the facts surrounding the disputed assignments were substantially identical to the facts in *Eastern Enterprises*. (Letter from Mott to Apfel of Sept. 28, 2000, Pl.'s Mem. of Points & Authorities in Support of Plaintiff's Motion for Partial Summary Judgment ("Pl.'s Mem.") Ex. 3.) The Commissioner denied plaintiff's request, concluding that plaintiff was not like Eastern because it is a related person to P & H, a signatory to a 1974 or later coal wage agreement promising lifetime health benefits to retirees. (Letter from Streckewald to Mott of Nov. 30, 2000, Pl.'s Mem. Ex. 4.) In Count I, Nell Jean challenges the Commissioner's decision assigning these retirees and requiring it to pay health care premiums to the Combined Fund on their behalf, claiming that it is indistinguishable from Eastern and that the Supreme Court's decision in *Eastern Enterprises* is controlling here.

## IV. The Supreme Court Decision in *Eastern Enterprises*

In *Eastern Enterprises* the Supreme Court was presented with a constitutional challenge to the Coal Act. Eastern was involved in coal mining operations until 1965 and was a signatory to coal wage agreements between 1947 and 1964. Notably, it was not a signatory to the 1974 agreement or any later agreement that expressly guaranteed lifetime health benefits for retirees and their families. Between 1963 and 1965, Eastern transferred its coal operations to a subsidiary, Eastern Associated Coal Corp ("EACC"). Eastern retained its interest in EACC until 1987, when it sold EACC to an unrelated company and left the coal industry. *Eastern Enterprises*, 524 U.S. at 516, 118 S.Ct. 2131. Unlike Eastern, EACC had signed the 1974 and 1978 coal wage agreements. *Id.* at 516, 118 S.Ct. 2131.

After enactment of the Coal Act, the Commissioner assigned Eastern liability for health premiums of more than 1,000 retired miners who had worked for Eastern prior to 1966. *Id.* at 517, 118 S.Ct. 2131. The assignment was based on Eastern's status as the signatory operator that employed the retirees for the longest period of time prior to the effective date of the 1978 coal wage agreement. § 9706(a)(3). Since Eastern terminated its relationship with EACC in 1987, years before the statutory date of July 20, 1992 for establishing related party status, the two entities were not related persons within the meaning of the Coal Act. Eastern challenged the assignment, arguing that the Coal Act violated the Takings and Due Process Clauses of the Fifth Amendment. *Id.* at 516, 118 S.Ct. 2131.

In the Supreme Court's splintered decision, a plurality concluded that application of the Coal Act to Eastern violated the Fifth Amendment as an unconstitutional taking. *Id.* at 498, 118 S.Ct. 2131. Justice Kennedy concurred in the judgment but dissented in part, finding that the Coal Act as applied to Eastern was not an unconstitutional taking, but that the Act violated Eastern's due process rights. *Id.* at 547–50, 118 S.Ct. 2131 (Kennedy, J., concurring). The four dissenting judges found that application of the Act to Eastern did not violate the Takings Clause or the Due Process Clause. *Id.* 554, 556–57, 118 S.Ct. 2131 (Breyer, J., dissenting).

Although there was no majority rationale for the Court's holding in *Eastern Enterprises,* both the plurality and Justice Kennedy recognized that since Eastern had not signed a coal wage agreement expressly promising lifetime health benefits to retired miners and their families, it could not have anticipated the "severe retroactive liability" that the Coal Act's allocation scheme imposed. This contributed to the Court's determination that the Coal Act is unconstitutional as applied to Eastern. *See id.* at 528–29, 118 S.Ct. 2131 ("[T]he Coal Act's allocation scheme is unconstitutional as applied to Eastern because it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience."); *id.* at 549, 118 S.Ct. 2131 ( "[I]n creating liability for events which occurred 35 years ago the Coal Act has a retroactive effect of unprecedented scope .... This case is far outside the bounds of retroactivity permissible under our law.") (Kennedy, J., concurring).

In response to the Supreme Court's decision in *Eastern Enterprises,* the Commissioner was required to void as unconstitutional all assignments made to coal operators that were substantially identical to Eastern. Plaintiff asserts that there are "no distinctions of consequence" be-

tween the facts in *Eastern Enterprises* and the facts in this case and that it should be treated like Eastern. (Pl.'s Mem. at 12.) Thus, in Count I, plaintiff argues that the application of the Coal Act to plaintiff is unconstitutional and its assignments should be voided. Second, in Count III, plaintiff challenges the 1999 assignment of an Eastern beneficiary and his dependants as a violation of the statutory assignment criteria in section 9706 of the Coal Act and sections 702 and 706 of the APA.

## LEGAL ANALYSIS

### I. Count I: Constitutional Challenge

#### A. Precedential Effect of *Eastern Enterprises*

■ Plaintiff's challenge to Count I depends entirely on its argument that the *Eastern Enterprises* decision is controlling.[6] Before this challenge can be addressed, it is essential to understand the limited precedential effect of that case. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds . . . ." *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (citation omitted). This rule is only applicable where "one opinion can be meaningfully regarded as 'narrower' then another." *Rappa v. New Castle County*, 18 F.3d 1043, 1057 (3d Cir.1994) (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C.Cir.1991)). In cases like *Eastern Enterprises*, however, where the opinions rep-

resent distinct approaches, "no particular standard constitutes the law of the land because no single approach can be said to have the support of a majority." *Rappa*, 18 F.3d at 1058. "[T]he only binding aspect of a splintered decision is its specific result . . . . *Eastern Enterprises* requires a finding that the Coal Act is unconstitutional" only in cases where the plaintiff "stand[s] in a 'substantially identical position to Eastern Enterprises with respect to both the plurality and Justice Kennedy's concurrence.'" *Anker Energy v. Consolidation Coal Co.*, 177 F.3d 161, 170 (1999) (quoting *Unity Real Estate Co. v. Hudson*, 178 F.3d 649, 659 (3d Cir.), *cert denied*, 528 U.S. 963, 120 S.Ct. 396, 145 L.Ed.2d 309 (1999)); *see also Association of Bituminous Contractors v. Apfel*, 156 F.3d 1246, 1255 (D.C.Cir.1998) ("the only binding aspect of *Eastern Enterprises* is its specific result—holding the Coal Act unconstitutional as applied to Eastern Enterprises").

#### B. Plaintiff is Not Substantially Identical to Eastern

■ As all parties agree, the dispositive question in Count I is whether plaintiff is in a substantially identical situation as Eastern. For if it is, *Eastern Enterprises* requires a finding that the Coal Act is unconstitutional as applied to plaintiff. *Unity Real Estate*, 178 F.3d at 659. Plaintiff asserts that it is in a substantially identical position as Eastern because both were assigned liability for their own former employees and neither had signed the 1974 coal wage agreement or any subsequent agreement with the UMWA that promised lifetime retiree health benefits. (Pl.'s Mem. at 10.) Plaintiff also points out

---

**6.** Plaintiff does not mount any constitutional challenge to the Coal Act except to say that it should be treated like Eastern. In fact, it makes no showing that the facts here provide an independent basis to sustain a finding that

the factors relevant to a court's regulatory takings analysis (see *Eastern Enterprises*, 524 U.S. at 529–37, 118 S.Ct. 2131) are applicable to plaintiff.

that both were affiliated with companies that were signatories to the 1974 coal wage agreement. (Pl.'s Mem. at 13.) Plaintiff argues that these facts compel a conclusion that the Commissioner's assignment of liability to plaintiff for its retired miners violates the Takings and Due Process Clauses of the Fifth Amendment. (Pl.'s Mem. at 12–13.)

Plaintiff, however, ignores the statutorily significant fact that Eastern had terminated its relationship to 1974 coal wage agreement signatory EACC prior to the July 20, 1992 date for establishing related person status under the Coal Act. *Eastern Enterprises*, 524 U.S. at 516, 118 S.Ct. 2131. In contrast, under the Act plaintiff *is* a "related person" to a post–1974 wage agreement signatory—P & H. Plaintiff does not contest this fact but asserts that it is not a "distinction of consequence," and that it should not impede a finding that *Eastern Enterprises* applies. (Pl.'s Mem. at 12.) Plaintiff notes that the *Eastern Enterprises* plurality and Justice Kennedy concluded that the Coal Act imposed an unconstitutional liability on Eastern without justification even though it was fully aware that Eastern's subsidiary, EACC, had signed 1974 and later coal wage agreements. (Pl.'s Mem. at 10–11.) Plaintiff seems to argue that the Court's recognition and disregard of Eastern's relationship to EACC should lead to a similar disregard of plaintiff's relationship to a post–1974 wage agreement signatory in this case. Again, plaintiff has ignored the fact that the Coal Act sets July 20, 1992 for determining related person status. § 9701(c)(2)(B).

Since Eastern and EACC were not related parties within the meaning of the Coal Act, there was no reason for the relationship between the two entities to impact the Supreme Court's decision. In contrast, plaintiff is a related person to a post–1974 signatory, and this fact distinguishes plaintiff from Eastern. *Eastern Enterprises* did not consider whether the assignment of liability for health care premiums to a signatory operator who did not sign a 1974 or later coal wage agreement but is a related person to a signatory to those agreements is unconstitutional, and thus, it is not controlling here.[7]

This result is consistent with decisions of the Third and Fourth Circuits and a number of district courts. In these cases the courts agree that the Coal Act is not unconstitutional as applied to a company that is a related person to a signatory to a 1974 or later coal wage agreement even if the company itself, like Eastern, was not a signatory to any of these agreements, and therefore, such a company cannot avail itself of the ruling in *Eastern Enterprises. See Anker Energy v. Consolidation Coal,* 177 F.3d 161, 172 (3d Cir.) (the fact that [plaintiff] Anker was a "related person" to a signatory to 1974 and later coal wage agreements "factually distinguishes Anker's situation from that of Eastern Enterprises and compels a finding that the [Coal] Act is constitutional in this instance"), *cert. denied,* 528 U.S. 1003, 120 S.Ct. 496, 145 L.Ed.2d 383 (1999); *Unity Real Estate v. Hudson,* 178 F.3d 649, 659 (3d Cir.) ("the very distinction that [plaintiff, Unity, was a related person to signatory to 1974 and later coal wage agreements] compels the conclusion that *Eastern Enterprises* is not on all fours with us"), *cert.*

---

**7.** Indeed, the plurality specifically noted that "[a]lthough EACC continued mining coal until 1987 as a subsidiary of Eastern, Eastern's liability under the Act bears no relationship to its ownership of EACC; the Act assigns East-ern responsibility for benefits relating to miners that Eastern itself, not EACC, employed ...." *Eastern Enterprises,* 524 U.S. at 530, 118 S.Ct. 2131.

*denied,* 528 U.S. 963, 120 S.Ct. 396, 145 L.Ed.2d 309 (1999); *Holland v. Big River,* 181 F.3d 597, 606 (4th Cir.1999) ("position of members of a control group upon whom liability is imposed only by virtue of that association is different from that of the NBCWA signatory in *Eastern Enterprises* "), *cert. denied,* 528 U.S. 1117, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000); *Wheeling–Pittsburgh Steel Corp. v. Barnhart,* No. 5:99CV60 slip op. at 19 (N.D. W. Va. Mar 29, 2002) (plaintiffs who did not sign a 1974 or later coal wage agreement but are related persons to one who made such a promise "do not stand in a position substantially identical to that of Eastern Enterprises and, therefore ... the holding of *Eastern Enterprises* is not applicable in this case"); *A.T. Massey Coal Co. v. Massanari,* 153 F.Supp.2d 813, 827 (E.D.Va.2001) (argument that plaintiff is "substantially identically situated to Eastern" is "unpersuasive" where it is undisputed that plaintiffs are related to numerous subsidiaries who signed the 1974 or later NBCWAs); *Shenango v. Apfel,* No. 99cv1035 slip op. at 7 (W.D.Pa. July 15, 2000) (*Eastern Enterprises* does not apply because "relevant link ... was not in place ... as Eastern ended its relationship with the signatory affiliate in 1987.... however, [in this case the] link was in place on July 20, 1992, the date Congress set for determining the relationship between signatory operators and related persons ...."). *But see Berwind v. Apfel,* 94 F.Supp.2d 597, 607–08 (E.D.Pa.2000), *appeal pending,* Nos. 00–3729, 00–3798, 00–3830 (argued Sept. 19, 2000) (finding that "[t]he Court ... cannot conscientiously differentiate between" plaintiff that did not sign 1974 or later coal wage agreement but was assigned liability for former employees and Eastern even though plaintiff was a related person to a signatory to the 1974 and later coal wage agreements and Eastern was not). Regardless of the similarities between plaintiff and Eastern, plaintiff's status as a related person to a post–1974 coal wage agreement signatory means that plaintiff cannot argue that the Court's holding in *Eastern Enterprises* is controlling here.

Nonetheless, plaintiff contends that it is "irrelevant" that it continued to be in a controlled group with P & H after the date for establishing related person liability and speculates that the Supreme Court's holding in *Eastern Enterprises* would not have changed even if Eastern and EACC were related persons under the Coal Act. Plaintiff argues that "the Court's decision turned on the fact that Eastern had not promised lifetime benefits to its UMWA miners" by signing the 1974 or any subsequent coal wage agreement—not on the promises made by a related person to its own employees. (Pl.'s Mem. at 16.) But this Court would not be so presumptuous as to try and predict what the Supreme Court would have decided had it been presented with this case. The decisive point is that the holding in *Eastern Enterprises* is limited to its particular facts and the facts surrounding plaintiff's case are different.

### C. Related Person Liability

Plaintiff attempts to obscure the factual distinctions with Eastern by taking a narrow view of related person liability. Plaintiff would limit the use of related person liability to cases where benefits are promised to retired coal miners by their former employers (as signatories to 1974 or later wage agreements) and the former employers are no longer in business. (Pl.'s Mem. at 17.) Under plaintiff's interpretation, only retired miners who worked for coal operators that signed a 1974 or later coal wage agreement would be entitled to health benefits under the Coal Act.

Courts have refused to interpret related person liability this narrowly or to focus

only on the employment relationships between the company assigned liability, the related person that was a signatory to a 1974 or later coal wage agreement, and the retirees assigned. Rather, courts have upheld the constitutionality of assignments in cases where the retirees had not been employed by a signatory to a 1974 or later wage agreement. For instance, in *Unity Real Estate,* plaintiff Unity was assigned former employees of a number of companies that were related persons to Unity. *Unity Real Estate v. Hudson,* 977 F.Supp. 717, 720 (W.D.Pa.1997), *aff'd,* 178 F.3d 649 (3d Cir.1999). Not all of the employers were signatories to the 1974 or later wage agreement. *Unity Real Estate,* 977 F.Supp. at 718–20. The Third Circuit upheld the constitutionality of these assignments even though most of the retirees assigned had never been employed by signatories to the 1974 or a subsequent wage agreement, and therefore, had not been promised lifetime benefits. *Unity Real Estate,* 178 F.3d at 655, *Unity Real Estate,* 977 F.Supp. at 718–20, Unity Real Estate Company's Responses to Defendant's First Request for Admissions ¶ 28.

Similarly, in *Shanango Inc.* and *Wheeling–Pittsburgh Steel Corp.,* plaintiffs were assigned liability based on their status as related persons to the former employers of the retirees. Neither the plaintiffs who were assigned liability nor the former employers were signatories to a 1974 or later wage agreement. Both plaintiffs and the former employers were, however, related persons to other companies that had signed a post–1974 agreement. The constitutionality of the Coal Act as applied in these cases was upheld despite the fact that neither the company assigned liability

nor the former employers had signed a post–1974 agreement.

Even where retirees were employed by a post–1974 signatory, the lynchpin of the courts' analysis upholding the constitutionality of their assignments was the existence of related persons who were signatories to a 1974 or later coal wage agreement—not the employment relationship of the plaintiffs, the related persons, and the retirees. *See, e.g., Holland v. Big River Minerals,* 181 F.3d at 606 (coal operators that are related persons to post–1974 signatory operators are not identically situated to Eastern; assignments are constitutional); *Anker Energy Corp. v. Consolidation Coal Co.,* 177 F.3d at 172 (same). The fact that plaintiff was not a signatory to a 1974 or later coal wage agreement does not eliminate the critical significance of its related person status to a 1974 or later coal wage agreement signatory. Thus, plaintiff's argument that the signatory status of the former employer is determinative of the constitutionality of the Coal Act must be rejected.

Plaintiff, nonetheless, points to *Berwind* in support of its narrow view of related person liability. (Pl.'s Mem. of Points and Authorities in Opposition to Defendants' Motions for Summary Judgment ("Pl.'s Opp.") at 15.) The *Berwind* court found the Coal Act unconstitutional as applied to a plaintiff that was not a signatory to a post–1974 coal wage agreement but was assigned liability for its former employees based on its status as a related person to a post–1974 coal wage agreement signatory. This Court is not persuaded by *Berwind's* rationale for a number of reasons.[8]

---

8. *See also A.T. Massey Coal Co.,* 153 F.Supp.2d at 833 n. 16 (finding *Berwind* less persuasive than the decision in *Shanango* in which the court found the Coal Act constitutional as applied to a plaintiff that was not a signatory to a post–1974 coal wage but was assigned liability for its former employees based on its status as a related person to a post–1974 coal wage agreement signatory).

First, *Berwind* suggests that its decision is consistent with the Third Circuit's decision in *Unity Real Estate. Berwind,* 94 F.Supp.2d at 606–07. However, its reliance on *Unity* is based on a misinterpretation of the underlying facts of that case. Unity's assignments were *not* all "based on employment of the beneficiaries by related companies which had promised to fund lifetime benefits," as the *Berwind* court suggests. *Id.* at 607. Most of the retirees assigned to Unity were not former employees of signatories to a 1974 or a subsequent coal wage agreement. *Unity Real Estate,* 178 F.3d at 655; *Unity Real Estate,* 977 F.Supp. at 718–20; Unity Real Estate Company's Responses to Defendant's First Request for Admissions ¶ 28. Unlike *Berwind,* however, the Third Circuit found the assignments constitutional regardless of whether the retirees had been employed by post–1974 coal wage agreement signatories. *Unity Real Estate,* 178 F.3d at 659. A "single [related] company's participation in the 'watershed' wage agreements was sufficient to impose liability for health benefits [to Unity] for miners who had worked for all the companies, not just those employed by the signatory company." *A.T. Massey Coal Co.,* 153 F.Supp. at 832.

■ Second, in finding the factual situation presented indistinguishable from *Eastern Enterprises,* the *Berwind* court ignored the statute's provision for joint and several liability, thereby defeating Congress' purpose for adopting the Coal Act. The *Berwind* court suggests that the provision of the Coal Act which requires the employment of a coal industry retiree by a signatory operator to be treated as employment by any related persons to such operator, § 9706(b)(1)(A), applies only to the aggregation of employment by different employers to calculate the retiree's length of service for assignment purposes. *See Berwind,* 94 F.Supp.2d at 607. Plaintiff makes this argument as well. (*See* Pl.'s Opp. at 15.) Both, however, fail to recognize that the same requirement is also contained, by reference, in the Act's definition of a "related person," thereby creating controlled group liability. *See* § 9701(c)(2)(A)(i) ("A person shall be considered to be a related person to a signatory operator if that person is a member of the controlled group of corporations (within the meaning of section 52(a)) which includes such signatory operator . . . ."); § 52(a) ("[A]ll employees of all corporations which are members of the same controlled group of corporations shall be treated as employed by a single employer."). The Coal Act creates controlled group liability for payment of retirees health care premiums because Congress wanted to "ensure that the statutory obligations to finance retiree health care could not be evaded through corporate manipulations . . . ." *Holland v. Keenan Trucking Co.,* 1995 WL 938644 at *1 (S.D.W.Va. Mar.15, 1995), *aff'd,* 102 F.3d 736 (4th Cir. 1996). "[B]ecause of the complex corporate structures which are often found in the coal industry" Congress intentionally made "the number of entities . . . . jointly and severally liable for a signatory operator's obligations under the definition of related persons . . . very broad." 138 Cong. Rec. 34002 (1992) (proposed Conference Committee report, placed in the record by Sen. Wallop). *Berwind* and plaintiff nonetheless steadfastly ignore these important concepts as well as Congress's intent.

Significantly, plaintiff does not challenge the constitutionality of the Coal Act's imposition of joint and several liability. Instead, it attempts to argue that the fact that it is a related company as of July 20 1992 to a 1974 coal wage agreement signatory should be of no significance. (Plaintiff's Reply to Defendants' Opposition to

Plaintiff's Motion for Partial Summary Judgment at 9.) However, this argument is unconvincing and illogical. As noted above, under the Coal Act, Nell Jean and P & H are jointly and severally liable for each other's Coal Act obligations and employment by any one member of their controlled group is to be treated as employment by each other member. *See* 26 U.S.C. §§ 52(a), 9701(c)(2)(A)(i), 9704(a), 9706(b)(1)(A). It is therefore impossible, as plaintiff attempts to do, to dismiss the import of controlled group liability by ignoring the clear intent of the Coal Act to treat the entire corporate family as a single enterprise.

Finally, *Berwind's* approach produces an illogical result. Retired coal miners who were employed by different—but related—corporate entities could receive different treatment based on the specific identity of their employers. Similarly, a company's liability for the health care premiums of the former employees of its control group members would vary depending on the employer. This is not what Congress intended, nor is it consistent with the result reached by the vast majority of courts to address the issue.

Plaintiff's crabbed views on related person liability are unpersuasive, for its status as a related person to P & H cannot be ignored. This distinction between plaintiff and Eastern places plaintiff beyond the reach of the Court's decision in *Eastern Enterprises*. Therefore this Court concludes that Count I must be dismissed, because the Coal Act is constitutional as applied to plaintiff and the Commissioner's refusal to void plaintiff's assignments was not arbitrary or capricious.

## II. Count III: Assignment of Tuness Tiller

In Count III, plaintiff seeks an order invalidating the Commissioner's Sep-tember 1999 assignment of Tuness Tiller and his dependents to plaintiff after the Commissioner voided his initial assignment in response to the Supreme Court's decision in *Eastern Enterprises*. Plaintiff alleges that this assignment violates the assignment criteria in section 9706 of the Coal Act and is arbitrary and capricious in violation of sections 702 and 706 of the APA. 5 U.S.C. §§ 702, 706.

The Commissioner assigned liability for Mr. Tiller's health care premiums to Eastern in 1992. (Pl.'s Mem. at 19.) In 1995 the Commissioner determined, based on a review of Mr. Tiller's earnings record that Mr. Tiller's assignment to Eastern had been an error. (Pl.'s Mem. at 19.) Mr. Tiller was then reassigned to Norfolk and Western Railway Co. ("N & W") as the signatory operator still in business that employed Mr. Tiller for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement. (Pl.'s Mem. at 20.) *See* 26 U.S.C. 9706(f)(3)(a) (procedure for addressing erroneous assignments). After the *Eastern Enterprises* decision, the Commissioner voided Mr. Tiller's assignment to N & W because N & W was an Eastern-type company to which retired miners could not be constitutionally assigned under the Coal Act. (*Id.*) The Commissioner moved Mr. Tiller, along with the other retirees who had been assigned to Eastern and similarly-situated companies, to the "unassigned" category. (*Id.* at 22.) Mr. Tiller was then assigned to plaintiff, pursuant to § 9706(a)(3), as the signatory operator that, aside from the Eastern-type companies, had employed him for the longest period of time prior to the 1978 coal wage agreement. (*Id.* at 20.)

Plaintiff contends that Mr. Tiller should have remained unassigned because the Commissioner does not have the authority to disregard employment by existing East-

ern-type companies and assign retirees to the "next-in-line" employer under § 9706(a)(3). Defendants assert that the Commissioner's action is consistent with the intent of the Coal Act and correct under § 9706(a).

■ Congress's intent in enacting the Coal Act was to ensure that retired coal miners receive the health care benefits that they are entitled to by identifying former employers and holding them responsible for funding the benefits for their former employees.

> [T]he legislative history of the Coal Act reflects an effort to "insure that every reasonable effort is made to locate a responsible party to provide the benefits before the costs are passed to other signatory companies which have never had any connection to the individual[.]" To this end, the Conference Committee Report declared that the Act's "overriding purpose is to find and designate a specific obligor for as many beneficiaries in the [Benefit] Plans as possible." The conferees further stated their "inten[tion] that the largest possible number of beneficiaries in the [Benefit] Plans be assigned to a specific or designated company[,]" and "that the number of unassigned beneficiaries is kept to a minimum."

*Holland v. Pardee Coal Co.*, 269 F.3d 424, 436 (4th Cir.2001) (quoting 138 Cong. Rec. S17604–05 (daily ed. Oct. 8, 1992)), *cert pending*, No. 01–1366 (docketed Mar. 18, 2002). The structure of the Act reflects this goal. By providing an elaborate set of assignment criteria and control group liability, Congress cast a wide net to capture as many responsible parties as possible to hold accountable for retiree benefits. Only those retirees whose former employers (and their related persons) no longer exist are left unassigned. The unassigned retirees receive benefits from reserved funds transferred from other sources to the Combined Fund by Congress or, if necessary, from premiums assessed proportionately against all assigned operators. 26 U.S.C. § 9704(a)(3), (d). Requiring Mr. Tiller and all other "Eastern-like" retirees to remain unassigned, as plaintiff urges, imposes the costs of their benefits on unrelated parties who have no connection to the retirees, thereby undermining a fundamental goal of the Act.

The Commissioner's alternative to leaving retirees unassigned is a reasonable one. The Commissioner made assignments under § 9706(a) by disregarding employment by Eastern and other Eastern-like companies and assigning retirees to the signatory operator that met the statutory requirements. In contrast to plaintiff's assertions, the Commissioner did not "add new provisions" to the Act by making these assignments. (Pl.'s Mem. at 23.) As found by the court in *Pittston Co. v. United States*:

> The argument that the re-assignments [of beneficiaries who previously had been assigned to companies similarly situated to Eastern] enlarged the statute is incorrect. The Coal Act, from its very language, always envisioned that the beneficiaries would be assigned to signatory operators. Removing Eastern and Eastern-like companies simply reduced the number of signatory operators: it did not expand the reach of the statute in terms of the number of beneficiaries.

*Pittston Co. v. United States*, Nos. 3:97cv294 & 01cv273, slip op. at 20–22 (E.D.Va.2002). Similarly, in *Wheeling–Pittsburgh Steel Corp.*, the court agreed that "the commissioner had the authority to reassign beneficiaries in response to the *Eastern Enterprises* [decision] and, thus, did not act in an arbitrary and capricious manner but, *rather*, acted within the bounds of the law." *Wheeling–Pittsburgh*

*Steel Corp.,* No. 5:99cv60 slip op. at 32. *But see Sidney Coal Co. v. Massanari,* 221 F.Supp.2d 755, 758 (E.D.Ky.2002) ("the Commissioner overstepped his authority in making the *Eastern Enterprises* type reassignments"). In this Court's view, the result reached in *Pittston Co.* and *Wheeling–Pittsburgh Steel Corp.,* as opposed to *Sidney Coal,* is more consistent with the intent of the Coal Act, for *Sidney Coal* would bar assignment under § 9706(a)(3) whenever the signatory operator that employed the retiree for the longest period of time and is still in existence is an Eastern-type company. Despite Congress' intent to reduce the number of unassigned retirees, these employees would remain unassigned even if they had worked for multiple signatory operators that are still in business.

Plaintiff cites *Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002), in support of its position that the Commissioner unlawfully assumed "a legislative function" by assigning Mr. Tiller. (Pl.'s Mem. at 22.) Plaintiff's reliance on this case is inapposite. In *Sigmon Coal,* the Supreme Court held that under the plain language of the Coal Act, a company that had purchased a signatory coal operator prior to enactment of the Coal Act was not a related person to the signatory operator, and therefore, could not be assigned responsibility for the signatory operator's retired employees. *Id.* at 951. The Supreme Court rejected the Commissioner's argument that it was reasonable to conclude that direct successors of a signatory operator should be responsible for the operator's employees. Since the two companies were not related persons within the meaning of the Coal Act, the successor company could not be assigned liability on that basis. Congress "did not delegate authority to the Commissioner to develop new guidelines or to

assign liability in a manner inconsistent with [an unambiguous] statute." *Id.* at 956.

■ That is not the situation here. The Commissioner is not developing new guidelines or making an "unfounded policy decision" (Pl.'s Mem. at 22), but is applying the Coal Act's assignment criteria in a reasonable and logical manner that is consistent with the statutory language in light of *Eastern Enterprises.* " '[W]henever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid.' " *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 684, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) (quoting *Regan v. Time,* 468 U.S. 641, 652, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984)). The Supreme Court's decision in *Eastern Enterprises* requires that the Coal Act's assignment criteria be construed in a way to allow it to "function effectively and serve [its] purpose . . . after the invalid application has been excised." *Carnival Cruise Lines v. United States,* 200 F.3d 1361, 1367 (Fed.Cir.2000). In the matter before this Court, the Commissioner is doing just that.

■ Plaintiff argues that Mr. Tiller should remain unassigned after *Eastern Enterprises* because he would have been unassigned if N & W had gone out of business. (Pl.'s Opp. at 28.) "Where an assigned operator goes out of business, the statute does not direct or authorize the Commissioner to re-examine beneficiary wage records for the purpose of reassigning that operator's beneficiaries to some other former employer." (Pl.'s Opp. at 27.) Plaintiff's view, however, ignores the fact that Mr. Tiller's assignment to plaintiff is significantly different than an assignment properly made to a company that

**26**

later goes out of business, for Mr. Tiller's assignment to N & W was never proper. The effect of the Supreme Court's decision in *Eastern Enterprises* was retroactive. *See Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) (" '[b]oth the common law and our own decisions' have 'recognized a general rule of retrospective effect for the constitutional decisions of this Court.' ") (quoting *Robinson v. Neil,* 409 U.S. 505, 507, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973)). It had never been constitutional for SSA to assign beneficiaries to Eastern-type companies under section 9706(a)(3) of the Coal Act. Even if the Commissioner may not reassign beneficiaries where the assigned operator goes out of business, it is the duty of the Commissioner to properly assign Eastern beneficiaries. Here, the Commissioner performed this duty by applying the assignment criteria in the Act as if the Eastern-type companies had never been available for assignment. Consequently, the Commissioner's assignment of liability for Mr. Tiller's health care premiums to plaintiff was not arbitrary or capricious, but a reasonable and lawful application of the Act in view of the holding of *Eastern Enterprises.*

### CONCLUSION

For the above reasons, the Court finds that the Coal Act is not unconstitutional as applied to plaintiff and the Commissioner's refusal to void plaintiff's assignment to fund health care benefits for retired miners is not arbitrary, capricious, or an abuse of discretion. Moreover, the Commissioner's assignment of retiree Tuness Tiller was lawful under the assignment criteria of the Coal Act and not an abuse of discretion. As a result, plaintiff's motion for partial summary judgment is denied and summary judgment is granted on behalf of defendant and the Trustees as to Counts I and III.

### ORDER

This matter is before the Court on plaintiff's Motion for Partial Summary Judgment [33–1]; Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment [34–1 and 34–2]; and Motion of the Trustees of the UMWA Combined Benefit Fund for Summary Judgment [32–1]. Based on the pleadings, the entire record and relevant case law, it is hereby

**ORDERED** that defendant's and defendant-intervenor's motions for summary judgment are **GRANTED** as to Counts I and III; and it is

**FURTHER ORDERED** that plaintiff's Motion for Partial Summary Judgment is **DENIED**; and it is

**FURTHER ORDERED** that Counts I and III of plaintiff's First Amended Complaint are **DISMISSED WITH PREJUDICE**; and it is

**FURTHER ORDERED** that Counts II, IV and V of plaintiff's First Amended Complaint are stayed pending the outcome of the Supreme Court's ruling in *Barnhart v. Peabody Coal* (No. 01–705) and *Holland v. Bellaire Corp.* (No. 01–715).

**SO ORDERED.**