*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0418p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SIDNEY COAL COMPANY, INC., *et al.*,
　　　　　　　　　　　*Plaintiffs-Appellees,*

　　　*v.*

SOCIAL SECURITY ADMINISTRATION,
　　　　　　　　　*Defendant-Appellant*
　　　　　　　　　　*(04-6286),*

MICHAEL H. HOLLAND, *et al.*,
　　　　　　　*Intervenors Defendants-*
　　　　　　　*Appellants (04-6291).*

Nos. 04-6286/6291

>

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.
No. 01-00076—Danny C. Reeves, District Judge.

Argued: July 28, 2005

Decided and Filed: October 19, 2005

Before: SILER and DAUGHTREY, Circuit Judges; MARBLEY, District Judge.[*]

---

## COUNSEL

**ARGUED:** Jonathan H. Levy, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Howard R. Rubin, SONNENSCHEIN, NATH & ROSENTHAL, Washington, D.C., for Appellants. John R. Woodrum, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, Washington, D.C., for Appellees. **ON BRIEF:** Jonathan H. Levy, William Kanter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Howard R. Rubin, William E. Copley, Jacqueline Sadker, SONNENSCHEIN, NATH & ROSENTHAL, Washington, D.C., Stephen J. Pollak, John T. Rich, GOODWIN PROCTER LLP, Washington, D.C., for Appellants. John R. Woodrum, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, Washington, D.C., H. Kent Hendrickson, RICE & HENDRICKSON, Harlan, Kentucky, for Appellees.

---

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

---

**OPINION**

---

ALGENON L. MARBLEY, District Judge.  In 1992, Congress enacted the Coal Industry Retiree Health Benefit Act, 26 U.S.C. §§ 9701-9722, 30 U.S.C. § 1232(h) (the "Coal Act"), which ensured that retired miners received their promised benefits by assigning each retiree to the coal company most responsible for that retiree's employee benefits.  In 1998, the Supreme Court, in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), declared part of the Coal Act unconstitutional insofar as it imposed liability on coal operators that had never signed an agreement promising to provide retirees with such benefits.  Because *Eastern Enterprises* left numerous miners without a company to provide for them, the Social Security Administration (the "SSA") assigned these miners to constitutionally-permissible coal operators, such as Plaintiffs-Appellees A.T. Massey Coal Co., Inc. and its subsidiaries,[1] thereby raising these companies' premiums.  To protest the post-*Eastern Enterprises* assignments, Plaintiffs-Appellees filed suit in the Eastern District of Kentucky, alleging that the SSA impermissibly interpreted and applied the Coal Act.  The Trustees of the United Mine Workers of America Combined Benefit Fund (the "Trustees") intervened as Defendants shortly after suit was filed.  The district court found in favor of Plaintiffs-Appellees, invalidating the post-*Eastern Enterprises* assignments to Massey and its subsidiaries.  On appeal, the SSA and the Trustees ("Defendants-Appellants") assert that the district court erred in concluding that the SSA overstepped its authority under the Coal Act.  Defendant-Appellants also argue that venue was not properly in the Eastern District of Kentucky because Massey is a Virginia-based company and only its subsidiaries reside in Kentucky.  For the following reasons, we **AFFIRM** the district court's decision that venue was proper, but **REVERSE** the district court's judgment relating to the Coal Act.

*FACTUAL AND PROCEDURAL BACKGROUND*

**I.  The Coal Act**

In 1947, the Bituminous Coal Operators' Association and the United Mine Workers of America negotiated the National Bituminous Coal Wage Agreement ("NBCWA"), which created a trust fund to provide pension plans and medical benefits to retired coal miners and their families.  This 1947 NBCWA resulted from a workers' movement to bring employee benefits to miners.  *Eastern Enterprises v. Apfel*, 524 U.S. 498, 504 (1998).  Prior to this agreement, miners received largely substandard health care from sometimes unskilled "company doctors."  *Id*.  Moreover, the cost of this company-provided care posed a substantial financial burden on individual miners.  *Id*.  The 1947 NBCWA, managed by three appointed trustees, funded the workers' pensions and medical benefits with the "the proceeds of a royalty on coal production."  *Id*. at 505-06.  In 1950, a new agreement made this trust fund a multiemployer one, which coal operators contributed to based on their production amounts.  Under the 1950 NBCWA, the miners and their dependents were not promised specific benefits; rather, the coal operators paid a fixed amount of royalties into a central fund, and the trustees charged with distributing benefits were required to remain within a budget.  *Id*. at 506-07.  As a result, the level of benefits provided was less than consistent.  *Id*. at 508.

In 1974, a successive agreement created four separate trusts and, for the first time, explicitly referenced benefits for retirees and their dependents.  Prior to this 1974 NBCWA, retirees had never been expressly included in the group of eligible beneficiaries.  Because of the expanded number of

---

[1]The other named Plaintiffs-Appellees are Sidney Coal Co., Martin County Coal Corp., New Ridge Mining Co., Road Fork Development Co., Rawl Sales & Processing Co., Tennessee Consolidated Coal Co., Omar Mining Co., and Peerless Eagles Coal Co., Inc.

eligible beneficiaries, these trust funds began experiencing financial difficulties, which the owners and unions tried to remedy in 1978 by enacting a modified agreement. This 1978 NBCWA, for the first time, required each coal operator, instead of paying a defined amount into a central fund, to fund specific benefits for its employees and retirees. The agreement also contained an "evergreen clause," which required each signatory to continue making contributions as long as it remained in the coal business, even if that coal operator never signed a future NBCWA. *Eastern Enters.*, 524 U.S. at 511.[2] Notwithstanding these efforts to maintain the trust funds' solvency, they continued to suffer financially. At the same time, coal companies tried to avoid paying benefits by either leaving the coal business altogether or refusing to hire union employees. *Id.* at 511 ("A spiral soon developed, with the rising cost of participation leading more employers to withdraw from the Benefit Plans, resulting in more onerous obligations for those that remained."). By 1990, the trust funds had incurred a $110 million deficit. Recognizing that more than 100,000 retirees were in danger of never receiving their employee benefits, in 1992 Congress passed the Coal Act.

The Coal Act created a new multiemployer trust fund, the United Mine Workers of America Combined Benefit Fund (the "Combined Fund"), which is still in effect today. It assessed annual premiums against any coal operator that both (1) had previously signed an NBCWA ("signatory operator") *and* (2) remained in business. 26 U.S.C. § 9701(c)(1) ("The term 'signatory operator' means a person which is or was a signatory to a coal wage agreement."). The Coal Act required coal operators who signed an NBCWA to pay an annual premium into the Combined Fund. The amount owed in premiums depended on the number of retirees and dependents for which each signatory operator was responsible. 26 U.S.C. § 9704(a)(1)-(3) (explaining that the health benefit premium, the death benefit premium, and the unassigned beneficiaries premium comprise each operator's annual premium). To determine which and how many beneficiaries to assign to each company, the Coal Act implemented the following three-tiered system of priorities:

> [T]he Commissioner of Social Security shall . . . assign each coal industry retiree who is an eligible beneficiary to a signatory operator which (or any related person with respect to which) remains in business in the following order:
>
> (1) First, to the signatory operator which--
>          (A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and  (B) was the most recent signatory operator to employ the coal industry retiree in the coal industry for at least 2 years.
>
> (2) Second, if the retiree is not assigned under paragraph (1), to the signatory operator which--
>          (A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and (B) was the most recent signatory operator to employ the coal industry retiree in the coal industry.
>
> (3) Third, if the retiree is not assigned under paragraph (1) or (2), to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement.

26 U.S.C. § 9706(a)(1)-(3).

---

[2]The 1978 NBCWA shifted the coal operators' liability "from a defined contribution obligation, under which employers were responsible only for a predetermined amount of royalties, to a form of defined benefit obligation, under which employers were to fund specific benefits." *Eastern Enters. v. Apfel*, 524 U.S. 498, 510-11 (1998).

Under the statute, then, the SSA must first try to assign a retiree to the coal operator that signed the 1978 or any later NBCWA and was the most recent operator to have employed the retiree for at least two years. § 9706(a)(1). If no such operator exists, the SSA then must attempt to assign the retiree to the operator that signed the 1978 or any later NBCWA and was the most recent signatory operator to have employed the retiree for any length of time. § 9706(a)(2). If no operator has yet been identified, the SSA assigns the retiree to the signatory operator who employed the retiree for the longest period of time prior to the date of the 1978 NBCWA, regardless of whether the operator signed the 1978 or any later NBCWA. § 9706(a)(3).

If the SSA cannot identify a signatory operator or related person still in business, as required by § 9706(a)(i)-(iii), the miner is deemed "unassigned." 26 U.S.C. §9706(d). To cover the cost of these so-called "unassigned beneficiaries," Congress authorized annual transfer payments to be made from the Abandoned Mine Reclamation Fund ("AML Fund") and the Combined Fund from a 1950 United Mine Workers of America Pension fund. 26 U.S.C. § 9705(a)-(b). Any gap in funding was to be covered by assessing each signatory operator an unassigned beneficiaries premium on a pro rata basis. 26 U.S.C. § 9704(d).

## II.  The Supreme Court Decision in *Eastern Enterprises*

The Supreme Court, in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 537 (1998), altered the Coal Act's application by voiding all assignments the SSA had made pursuant to the statute's third prong. 26 U.S.C. § 9706(a)(3) ("Third, if the retiree is not assigned under paragraph (1) or (2), [the Commissioner shall assign the retiree] to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement."). Eastern Enterprises had been a part of the 1947 and 1959 NBCWA's, but had not, since then, been a signatory to any other NBCWA. Yet, under the Coal Act's third prong, it became responsible for over 1,000 retired miners who had worked for the company before 1966, based on Eastern's status as "the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement." *Id*. at 517; § 9706(a)(3).

In a plurality opinion, the Supreme Court held unconstitutional the assignments to Eastern Enterprises and any other company in a similar situation, i.e., those that had not signed the 1974 NBCWA or any subsequent NBCWA ("*Eastern*-type" companies). The Supreme Court reasoned that because these companies had not participated in any agreement promising lifetime medical benefits to retirees, they should neither be held to such a promise nor forced to contribute to the Combined Fund.[3] *Id*. at 535 ("Not until 1974 . . . could lifetime medical benefits under the multiemployer agreement have been viewed as promised."). Although there was no majority rationale in *Eastern Enterprises*, the plurality and Justice Kennedy, who concurred in part and dissented in part, found that the Coal Act's "severe retroactive liability" could not be constitutionally applied to those operators who had not signed a coal wage agreement explicitly promising miners lifetime health benefits. *Id*. at 537, 547. As a result, the Supreme Court voided all assignments that the SSA had made to Eastern Enterprises and all similarly-situated companies.

---

[3]Justice O'Connor, writing for a four-justice plurality, found that assigning beneficiaries to operators, like Eastern Enterprises, who had taken no part in a post-1974 agreement amounted to a violation of the Fifth Amendment's takings clause. *Eastern Enters.*, 524 U.S. at 522-38. Justices Rehnquist and Scalia joined her opinion, and Justice Thomas concurred. Justice Kennedy, who concurred in part and dissented in part, found no violation of the Takings Clause because the Coal Act was economic legislation and thus, could not infringe upon a specific property right. Instead, Justice Kennedy concluded that § 9706(a)(3) constituted a violation of the Due Process clause. *Id*. at 547-50. The four-justice dissent, written by Justice Breyer, agreed with Justice Kennedy's analysis that the Takings Clause does not encompass economic legislation, but found that the § 9706(a)(3) Coal Act did not violate due process. *Id*. at 554-68.

In fall 1998, pursuant to *Eastern Enterprises*, the SSA invalidated all assignments it had made to any *Eastern*-type company since the Combined Fund's inception on February 1, 1993, and temporarily designated these so-called "*Eastern* beneficiaries" as "unassigned." In fall 1999, the SSA assigned approximately 1,500 *Eastern* beneficiaries to coal operators, like Plaintiffs-Appellees, that had employed the retired miners for the longest period and to whom it was constitutional to make assignments under § 9706, i.e., only those coal operators that had signed a 1974 NBCWA or later agreement and that remained in business.[4] Of these 1,500 *Eastern* beneficiaries, the SSA assigned eighteen beneficiaries and their dependents to Plaintiffs-Appellees.

### III. Procedural History

Plaintiffs-Appellees brought suit in the Eastern District of Kentucky challenging the SSA's authority to reassign those beneficiaries whose initial assignments were invalidated by *Eastern Enterprises*. Plaintiffs-Appellees asked the district court both to vacate the challenged assignments and enjoin the SSA from making such assignments in the future. In May 2001, the Trustees moved to intervene as Defendants. The district court granted the Trustees' motion, holding that "the Trustees have a substantial legal interest in ensuring that the beneficiaries maintain their current assignments." The parties then filed cross-motions for summary judgment. Additionally, the SSA moved to transfer the case, arguing that Massey, the parent company, had manufactured venue in Kentucky to take advantage of favorable Sixth Circuit precedent.[5]

The district court concluded both that venue was proper and that Plaintiffs-Appellees' argument was correct: the SSA had exceeded its power when reassigning *Eastern* beneficiaries. With regard to venue, the district court found that, since 1971, all federal courts interpreting the applicable venue statute, 28 U.S.C. § 1391(e)(3), found it required only one plaintiff to reside in the selected district. Thus, the district court concluded, venue was proper because at least one Plaintiff-subsidiary resided in the Eastern District of Kentucky.

Turning to the reassignment of *Eastern* beneficiaries, the district court acknowledged that the Coal Act failed to address explicitly the post-*Eastern Enterprises* landscape, but concluded that the SSA's construction was impermissible because it contravened the statute's plain and unambiguous language. The district court rejected the SSA's argument that its interpretation effectuated congressional intent by assigning the beneficiaries to the most responsible operators,

---

[4] The third prong of the statute reads:

Third, if the retiree is not assigned under paragraph (1) or (2), to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement.

26 U.S.C. § 9706(a)(3). Because the SSA could no longer constitutionally assign any beneficiaries to a coal operator that had not signed a 1974 or later NBCWA, the SSA applied this provision to a newly narrowed pool of qualified companies.

[5] In Counts I and II, which are not now before the court, Plaintiffs-Appellees challenged the SSA's authority to make initial assignments on or after October 1, 1993, arguing that such an action was outside of the statute's plain language. The statute, Plaintiffs argued, explicitly requires: "The Commissioner of Social Security *shall, before October 1, 1993,* assign each coal industry retiree . . . to a signatory operator which (or any related person with respect to which) remains in business . . . " 26 U.S.C. § 9706(a) (emphasis added). At the time Plaintiffs-Appellees filed suit in the Eastern District of Kentucky, this Court's precedent was uniquely favorable to coal operators because in *Dixie Fuel Co. v. Commissioner of Social Security*, 171 F.3d 1052 (6th Cir. 1999), this Court had held that the Coal Act's plain language indeed precluded any post October 1, 1993 assignments. The Supreme Court disagreed and overruled *Dixie Fuel* in *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003), holding that the SSA *did* have the authority to make such assignments. ("[T]here is . . . no implication that the Commissioner is powerless to make an initial assignment to an operator after the specified date . . . ."). In light of *Peabody Coal*, there are no *Dixie Fuel*-related claims before us today.

reasoning that *Eastern* beneficiaries should simply be designated as unassigned.[6]  Accordingly, the district court declared all reassignments to Plaintiffs-Appellees to be null and void.

Following this ruling, Defendants-Appellants appealed to this Court, which, on April 1, 2004, *sua sponte* dismissed the appeal for lack of jurisdiction, stating that the district court had failed to provide a sufficient explanation for its certification of issues for appeal.  Upon remand to the district court, Defendants-Appellants requested that the district court reconsider its decision in light of contrary subsequent authority from the Fourth Circuit and the District Court of the District of Columbia, which favored Defendants-Appellants' position regarding post *Eastern Enterprises* assignments.[7]  Although the district court issued an order acknowledging the non-binding decisions of *Pittson* and *Nell Jean*, it reaffirmed its initial determination that the SSA acted *ultra vires*, and entered final judgment in favor of Plaintiffs-Appellees.  Defendants-Appellants now appeal from this judgment.

## *ANALYSIS*

### I. Standard of Review

Because the district court granted summary judgment on undisputed facts, this Court reviews the questions of law *de novo*.  *Herman v. Collis Foods, Inc*., 176 F.3d 912, 916 (6th Cir. 1999).

### II. Venue

The SSA argues that venue is not proper in the Eastern District of Kentucky because only four of eight subsidiary-plaintiffs reside in Kentucky, not one of which actually received a post-*Eastern Enterprise*s assignment.[8]  These Kentucky subsidiaries, the SSA emphasizes, are merely jointly and severally liable should a non-resident Plaintiff default.  26 U.S.C. § 9704(a) ("Any related person with respect to an assigned operator shall be jointly and severally liable for any premium required to be paid by such operator.").[9]  The SSA argues that Massey manufactured venue in the Eastern District of Kentucky in order to take advantage of *Dixie Fuel Co. v. Commissioner of Social Security*, 171 F.3d 1052 (6th Cir. 1999), *overruled by Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003).  *Dixie Fuel* was then-favorable Sixth Circuit precedent that would have invalidated any post October 1, 1993 assignments made to Plaintiffs-Appellees, thereby substantially lowering their financial obligations to beneficiaries.  Although Plaintiffs-Appellees can no longer benefit from

---

[6]The district court noted that when Congress has intended for "next in line" assignments to be made, characterizing the SSA's application of the Coal Act as such, Congress has explicitly provided for those assignments by statute, as it did in the Black Lung Benefits Act, 30 U.S.C. § U.S.C. § 901, *et. seq.*, which contains a fallback option and criteria for apportioning liability among more than one operator.  *See* 30 U.S.C. § 932(h); 20 C.F.R. § 725 (establishing "responsible operator" criteria).

[7]*See Pittston Co. v. United States*, 368 F.3d 385, 405 (4th Cir. 2004) (concluding that the Commissioner's application of 26 U.S.C. § 9706(a) in making ninety-five reassignments to Pittston following *Eastern Enterprises* was a permissible construction of the Coal Act); *Nell Jean Indus., Inc. v. Barnhart*, 224 F. Supp. 2d 10, 26 (D.D.C. 2002) (holding that the Commissioner's assignment of liability for a beneficiaries' care premiums to a coal operator was a reasonable and lawful application of the Coal Act in view of the holding of *Eastern Enterprises*).

[8]Of Plaintiffs-Appellees, only Sidney Coal Co., Martin County Coal Corp., New Ridge Mining Co., and Road Fork Development Co. reside in Kentucky.

[9]An operator is "related" to another signatory operator if the former is (1) a member of the controlled group of corporations which includes such signatory operator; (2) a trade or business which is under common control with such signatory operator; or (3) any other person who is identified as having a partnership interest or joint venture with a signatory operator in a business within the coal industry, but only if such business employed eligible beneficiaries, except that this clause shall not apply to a person whose only interest is as a limited partner.  26 U.S.C. § 9701(c)(2)(A)(i)-(iii).

the now-overruled *Dixie Fuel*, the SSA argues that an affirmation of the district court's finding that venue was proper would essentially endorse forum-shopping. Such an outcome, the SSA asserts, would encourage non-resident parent companies, like Massey, to sue in any one of the districts in which a subsidiary resides.[10]

> The relevant statutory provision is 28 U.S.C. § 1391(e)(3), which reads:
>
> A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (1) a defendant in the action resides, (2) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) *the plaintiff* resides if no real property is involved in the action.

28 U.S.C. § 1391(e) (emphasis added). The SSA urges this Court to interpret the words "the plaintiff," as found in § 1391(e)(3), to require *each* plaintiff or *all* plaintiffs to reside in the judicial district, thereby precluding venue in Kentucky because all plaintiffs do not reside therein. While conceding that no court has interpreted the statute as such since the statute's enactment in 1962, the SSA asks this Court to take a fresh look.

The statute's legislative history and the plethora of case law interpreting the statute, taken together, persuade this Court that § 1391(e)(3) contains no requirement that all plaintiffs must reside in the same district. When interpreting the purpose of a provision, "the court will not look merely to a particular clause in which general words may be used, but will take in connection with it . . . the objects and policy of the law." *Stafford v. Briggs*, 444 U.S. 527, 535 (1980) (interpreting § 1391(e)). In *Stafford*, the Supreme Court analyzed the hearing transcripts of the House Committee on the Judiciary, and found that Congress had passed this statute with the very specific purpose of easing plaintiffs' burdens when suing government entities:

> The purpose of this bill is to make it possible to bring actions against Government officials and agencies in U.S. district courts outside the District of Columbia, which because of certain existing limitations on jurisdiction and venue, may now be brought only in the U.S. District Court for the District of Columbia.

*Id.* at 539-40 (quoting H.R. Rep. No. 1936, 86th Cong., 2d Sess., 3-4 (1960)). The Supreme Court explained that prior to 1962, only courts in the District of Columbia were constitutionally permitted to issue writs of mandamus against government agencies and officials, forcing litigants seeking mandamus relief against government entities to incur "significant expense and inconvenience in bringing suits for enforcement of claimed rights." *Stafford*, 444 U.S. at 534. Section 1391(e) aimed to make it more convenient for an aggrieved person to file suit against a federal entity. Thus,

---

[10]In addition to the *Dixie Fuel* issue, the SSA offers a second piece of evidence to prove that Plaintiffs-Appellees engaged in forum-shopping. The SSA argues that Massey and many of its subsidiaries filed in Kentucky because they had already lost a similar lawsuit in the Eastern District of Virginia. *See A.T. Massey Coal Co. v. Massanari*, 305 F.3d 226 (4th Cir. 2002). The SSA's characterization of the suit, however, is somewhat misleading. In *Massanari*, Massey argued that it stood in a "substantially identical position" to Eastern Enterprises because it had not signed the 1974 or any subsequent NBCWA; therefore, all assignments to it should be similarly invalid. The Fourth Circuit rejected Massey's argument, explaining that a coal operator would be "substantially identical" to Eastern Enterprises only if it had *no* connection to the 1974 or a subsequent NBCWA. *Id.* at 237, 241 (finding that although A.T. Massey had not signed the relevant agreements, several members of the Massey Group, of which A.T. Massey was a part, had done so).

interpreting the phrase "the plaintiff" to mean "all plaintiffs" or "each plaintiff" would substantially limit the statute's breadth and undermine congressional intent.[11]

Each court faced with the same issue has interpreted "the plaintiff" to mean "any plaintiff," finding that Congress intended to broaden the number of districts in which suits could be brought against government entities. Although this Court has not yet interpreted § 1391(e)(3), the district court correctly noted that the broad interpretation "is not only the majority view - - it is the only view adopted by the federal courts since 1971."[12] *See, e.g.*, *Exxon v. Fed. Trade Comm'n*, 588 F.2d 895, 898-99 (3d Cir. 1978) ("[R]equiring every plaintiff in an action against the federal government or an agent thereof to independently meet section 1391(e)'s standards would result in an unnecessary multiplicity of litigation. The language of the statute itself mandates no such narrow construction. There is no requirement that all plaintiffs reside in the forum district."); *A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290, 1302 (N.D. Ala. 2003) (noting that both the SSA and the Trustees conceded at oral argument that "they could not identify a single case deciding that § 1391(e)(3) should be interpreted to mean *all* plaintiffs," concluding that venue was proper even though only two out of ninety-eight plaintiff coal-operators resided in the district); *Quarles v. Gen'l Inv. & Dev. Co.*, 260 F. Supp. 2d 1, 12 (D.D.C. 2003) (citing *Exxon* and finding that § 1391 contains "a far less restrictive requirement" than other venue statutes, and noting that it was passed to remedy specific problems inherent in suing government entities); *Dukes v. Wal-Mart Stores, Inc.*, No. Civ.A. 01-2252, 2001 WL 1902806, at *6 (N.D. Cal. Dec. 3, 2001) (noting that "*Stafford* makes clear that Congress passed Section 1391(e) to rectify specific venue and jurisdictional constraints"; stating "[t]he *Exxon* court's rejection of the proposition that every plaintiff must satisfy venue is amply supported by the legislative history accompanying the adoption of 1391(e)."); *Favereau v. United States*, 44 F. Supp. 2d 68, 70 (D. Me. 1999) (finding § 1391(e)(3) more permissive than preclusive because it permits an action to be brought in "*any* judicial district in which . . . the plaintiff resides" whereas a comparable venue statute, 28 U.S.C. § 1402(a), permits an action to be brought "*only* . . . in the judicial district where the plaintiff resides") (emphasis added); *Minn-Dak Farmers Coop. v. Espy*, 851 F. Supp. 1423, 1425 (D. N.D. 1994) ("This court does not believe Congress intended each and every plaintiff with a cause of action against a governmental officer located in Washington, D.C. to travel to that city to plead his or her case. Such a requirement would exalt the federal officer or employee above the citizens he is bound to serve."); *see also* 15 Charles A. Wright, Arthur R. Miller and Edward H. Cooper, Federal Practice and Procedure, § 3815 (2d ed. 1986) (commenting that changing § 1391(e)(3) to read "a plaintiff" instead of "the plaintiff" is "unnecessary" because

---

[11]The SSA asserts that Congress's true intent can be found in the Senate's deliberate decision to replace "*a* plaintiff," which appeared in the House of Representatives's version of the bill, H.R. Rep. No. 87-536, at 6 (1961), with "*the* plaintiff," when the bill moved through the Senate. *See* 108 Cong. Rec. S18783 (daily ed. Aug. 31, 1962) (statement of Sen. Mansfield). Similarly, the SSA asks us to discern legislative intent from the statute's use of "a" in § 1391(e)(1) (allowing venue in a district where "*a* defendant in the action resides"), as compared to the use of "the" in § 1391(e)(3) (limiting venue to the district in which "*the* plaintiff resides"). *Id.* (emphasis added). These two arguments, however, do not persuade us to reach a different result. The legislative history does not focus, or even substantively comment, as to Congress's reason for replacing "a" with "the"; instead, the legislative history emphasizes the statute's purpose, which was to broaden the venues available to plaintiffs for suits against the federal government. Accepting the SSA's argument would undermine Congress's clearly stated intent.

[12]The SSA asserts that the Supreme Court's ruling in *Smith v. Lyon*, 133 U.S. 315, 317 (1890), requires the conclusion that "the plaintiff" should be interpreted in the singular, as "each plaintiff" or as "all plaintiffs." There, the Supreme Court, interpreting a different residency-based venue statute, rejected the proposition that "it is sufficient if the suit is brought in a state where . . . one of the plaintiffs is a citizen," indicating that all plaintiffs needed to reside in the same district. *Id.* at 317. The SSA's reliance on *Smith v. Lyon* is misplaced. As stated by the district court, *Smith* referenced an 1887 federal diversity statute that is by no means binding precedent with regard to this Court's interpretation of § 1391(e)(3). Indeed, the statute at issue in *Smith* was superceded in 1966 by Congress's enactment of 28 U.S.C. § 1406, which provided district courts some flexibility when making a venue determination. Thus, *Smith* has no bearing on this Court's interpretation of § 1391(e)(3).

"courts have read the statute as if the change had been made and have held that only one plaintiff need satisfy the residency requirement.").

In sum, the case law and legislative history compel this Court to hold that the residency requirement of 28 U.S.C. § 1391(e)(3) is satisfied if at least one plaintiff resides in the district in which the action has been brought. Thus, the district court's holding with regard to venue is **AFFIRMED**.

### III.  Assignment of *Eastern* Beneficiaries

Where a statute addresses clearly "'the precise question at issue,'" we "'must give effect to the unambiguously expressed intent of Congress.'" *Barnhart v. Walton*, 535 U.S. 212, 217 (2002) (citing *Chevron, U.S.A, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). In this case, the Coal Act contains no language as to how the SSA should have handled the precise question raised by the *Eastern Enterprises* holding. Without explicit guidance, the SSA, working with a newly narrowed group of qualified coal operators, assigned each *Eastern* beneficiary to the coal operator that had employed that beneficiary for the longest time prior to the effective date of the 1978 NBCWA, but who had also signed a 1974 or later NBCWA. The question becomes, then, whether the SSA, in its effort to comply with *Eastern Enterprises*, permissibly construed the statute. *See Pittston Co. v. United States*, 368 F.3d 385, 402 (4th Cir. 2004) ("Because Congress provided no explicit instructions, the question presented is whether the Commissioner's reassignments under § 9706(a) are 'based on a permissible construction of the statute.'") (citing *Chevron*, 467 U.S. at 843).

To determine whether the SSA permissibly construed the statute, the rules of statutory construction tell us to determine "(1) whether the statute unambiguously forbids the Agency's interpretation, and, if not, (2) whether the interpretation, for other reasons, exceeds the bounds of the permissible." *Walton*, 535 U.S. at 218. Plaintiffs-Appellees argue that in assigning eighteen *Eastern* beneficiaries and their dependents to Massey and its subsidiaries, the SSA impermissibly interpreted the Coal Act, asserting that all *Eastern* beneficiaries should have been designated permanently as "unassigned." We disagree. For the reasons stated below, we hold that the SSA permissibly construed the Coal Act when it assigned the *Eastern* beneficiaries to Plaintiffs-Appellees.

Plaintiffs-Appellees assert that the statute's plain language unambiguously forbids the SSA's post-*Eastern Enterprises* assignments because, first, the Coal Act provides for assignment to "one – and only one" coal operator, emphasizing that § 9706(a)(3) requires the SSA to assign beneficiaries to "*the* signatory operator," highlighting the singular nature of the Coal Act's words:

> [I]f the retiree is not assigned under paragraph (1) or (2), to *the* signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement.

26 U.S.C. § 9706(a)(3) (emphasis added). Citing § 9706(a)(3), Plaintiffs-Appellees emphasize that the statute contains no fallback provision instructing the SSA to assign beneficiaries to the next most responsible operator:[13]

> In this case, "the signatory operator which employed the [miners at issue] in the coal industry for a longer period of time than any other signatory operator prior the

---

[13] Like the district court, Plaintiffs-Appellees compare the Coal Act to the Black Lung Benefits Act, 30 U.S.C. § 901, *et. seq.*

effective date of the 1978 coal wage agreement" and which "remains in business" is indisputably Eastern (or Blue Diamond or Alabama Power).  That they can not be made to pay for miners Congress allocated to them by no means elevates Appellees into liability. . . . Congress made no provision in the Act for a next most responsible operator.

Plaintiffs-Appellees then argue that the statute unambiguously states that only *two* types of employment can be disregarded under the statute:  employment with a coal operator no longer in business and employment with a coal operator during a period when that operator "was not a signatory to a coal wage agreement."  26 U.S.C. § 9706(b)(1)(B).[14]  Because employment with an *Eastern*-type company is not explicitly listed, Plaintiffs-Appellees argue, such employment cannot be disregarded, contending that the Supreme Court's decision in *Eastern Enterprises* may have "prevented *assignment* of the retiree" to an *Eastern*-type company, but did not prevent *consideration* of that company.  Plaintiffs-Appellees assert that by ignoring these statutory constraints, the SSA made the type of "unfounded policy decision" held invalid by the Supreme Court in another Coal Act case, *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 451-52 (2002) (holding that the SSA impermissibly stepped outside of the Coal Act's plain language when it assigned liability to the purchaser of a defunct coal operator, reasoning that the purchaser was not a "related person" under the Act's definition thereof).

Plaintiffs-Appellees' arguments concerning the statute's express limitations on the SSA's authority ignore the retroactive nature of *Eastern Enterprises*, which held that all assignments to *Eastern*-type companies *since February 1, 1993* had been unconstitutionally imposed.  *See Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 311-12 (1994) (holding a "judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction").  In other words, *Eastern Enterprises* held that the SSA "*should never have assigned* the retirees to Eastern *in the first place*." *Pittston Co.,* 368 F.3d at 403.  After determining that its *Eastern*-type assignments were "invalid from the beginning," the SSA began anew, assigning beneficiaries "to comport with the terms of the statute as well as the Constitution." *Id.*

By assigning each *Eastern* beneficiary to the operator to whom they should have been assigned in 1993, i.e., only those operators that had signed a 1974 NBCWA or later agreement, the SSA applied the criteria in a manner that allowed the Act to "function effectively and serve [its] purpose even after the invalid application has been excised." *Carnival Cruise Lines, Inc. v. United States*, 200 F.3d 1361, 1367 (Fed. Cir. 2000).[15]  Furthermore,  Plaintiffs-Appellees' reliance on

---

[14]The provision, in full, reads:
(B) Certain employment disregarded.--Employment with--
    (i) a person which is (and all related persons with respect to which are) no longer in business, or
    (ii) a person during a period during which such person was not a signatory to a coal wage agreement,
    shall not be taken into account.
26 U.S.C. § 9706(b)(1)(B)(i)-(ii).

[15]Plaintiffs-Appellees argue that the general severability clause found in Title 26 forbade any sort of reassignment of Eastern beneficiaries:

If any provision of this title, or the application thereof to any person or circumstances, is held invalid, the remainder of the title, and the application of such provision to other persons or circumstances, *shall not be affected thereby*.

26 U.S.C. § 7852(a) (emphasis added).  This severability clause, Plaintiffs-Appellees assert, mandates that *Eastern* beneficiaries be labeled "unassigned," noting that the SSA did just that for several months after the *Eastern Enterprises* ruling. (Pls.-Appellees Br. at 32).
    The Supreme Court's decision effectively excised now-ineligible companies from the list of coal operators to

*Sigmon Coal* is misplaced. There, the Supreme Court analyzed a statutory provision of the Coal Act in which there was no constitutional infirmity, holding that the SSA had interpreted a provision in contravention of the provision's unambiguous meaning. *Sigmon Coal Co.*, 534 U.S. at 461-62 ("When the words of a statute are unambiguous, then . . . 'judicial inquiry is complete.'") (citing *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253-254 (1992)). In this case, however, the SSA had to respond to an unforeseen situation resulting from a Supreme Court ruling that declared a statutory application unconstitutional. This situation, unlike the one presented in *Sigmon Coal*, was neither addressed nor contemplated by the statute's plain language.

To the extent that Plaintiffs-Appellees argue that the SSA's decision to disregard consideration of *Eastern*-type employment impermissibly broadens § 9706(b)(1)(B), which instructs the SSA to disregard only two types of employment, the statute's explicit reference to two types of employment need not preclude adding another to the list. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) ("We do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.") (citing *United Dominion Industries, Inc. v. United States*, 532 U.S. 822, 836 (2001)). Plaintiffs-Appellees have not demonstrated that Congress "considered the unnamed possibility and meant to say no to it." Indeed, there is no evidence that Congress seriously contemplated that the Coal Act would be partially invalidated. We will not read an intended omission of *Eastern*-type assignments into § 9706(b)(1)(B) because we see no evidence that Congress demanded as such.[16] *Id*. at 168 ("[T]he canon *expressio unius est exclusio alterius* . . . has force only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence.") (citing *United States v. Vonn,* 535 U.S. 55, 65 (2002)). In short, in light of the *Eastern Enterprises* opinion's retroactive holding, neither the singular nature of the Coal Act's words nor the limited list of disregarded employment forbids the SSA's interpretation and application.

In finding the SSA's interpretation of the statute permissible, we are guided by the Coal Act's legislative history. Congress's primary purpose in enacting the Coal Act was to "identify persons most responsible for plan liabilities" and to "provide for the continuation of a privately financed self-sufficient program for the delivery of health care benefits." Energy Policy Act of 1992, Pub. L. 102-486, § 19142, 106 Stat. 3037 (1992). Congress also intended to keep the number of unassigned beneficiaries to a minimum by reserving that category for those miners whose former employers were no longer in business.

---

whom beneficiaries could be constitutionally assigned, thereby creating a smaller pool of qualified operators. The SSA simply applied the statute to the newly narrowed pool. As stated by the court in *Pittston*, 368 F.3d at 404, by removing from the eligible pool those coal operators constitutionally precluded from contributing, the SSA, "among the remaining contributors . . . followed the Coal Act's assignment structure to the letter." *Id.* ("[I]n making reassignments, the Commissioner did not change the wording of the statute, but merely followed the Supreme Court's ruling that the Coal Act may only apply to a narrower group of persons than previously thought."). The fact that certain companies' liability increased because of the SSA's application of the Coal Act does not violate the clause "shall not be affected thereby." *Id*. at 405. Rather, that phrase only requires that the statute remains applicable to still-eligible coal operators.

[16]Plaintiffs-Appellees, in support of their contention that Congress intended the provisions of § 9706(b)(1)(B) to be exclusionary, cite to a post-*Eastern Enterprises* exchange between Senators Brownback, Rockefeller, and Conrad, in which the Senators express their reluctance to modify the statute. Senator Rockefeller states: "[O]nce you start to clarify a law that was passed, indeed, as a compromise, . . . once one gets into the clarification of the language of law, I start to sweat." *Agency Management of the Implementation of the Coal Act: Hearing Before the Subcomm. on Oversight of Gov't Mgmt., Restructuring and The District of Columbia of the Senate Comm. on Gov't Affairs*, 105th Con. 14-15 (1998). While this exchange may be relevant to Congress's decision not to revise the law in light of *Eastern Enterprises*, it does not persuade us that Congress deliberately intended to prevent any additional type of employment from being disregarded.

The Supreme Court's opinion in *Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003), is instructive. There, coal operators objected to any assignments made by the Commissioner of SSA after October 1, 1993, because the plain language of § 9706(a) stated that the Commissioner "shall" complete all assignments before that date. 26 U.S.C. § 9706(a) ("The Commissioner of Social Security *shall*, before October 1, 1993, assign each coal industry retiree . . . to a signatory operator which (or any related person with respect to which) remains in business . . . .") (emphasis added). The coal operators in *Barnhart* thus argued that any tardy assignment exceeded the Commissioner's statutory authority. *Id*. at 155. The Supreme Court rejected the coal operators' textual argument, reasoning, in part, that invalidating all assignments made after October 1, 1993 would undermine the statute's intended purpose: to allocate as many miners as possible to the coal operator most responsible for a particular miners' benefits. The *Barnhart* Court stated:

> In the words of Senator Wallop's report delivered shortly before enactment, the statute is "designed to allocate the greatest number of beneficiaries in the Plans to a prior responsible operator. For this reason, definitions are intended by the drafters to be given broad interpretation to accomplish this goal." 138 Cong. Rec. 34001 (1992). To accept the companies' argument that the specified date for action is jurisdictional would be to read the Act so as to allocate not the greatest, but the least, number of beneficiaries to a responsible operator. The way to reach the congressional objective, however, is to read the statutory date as a spur to prompt action, not as a bar to tardy completion of the business of ensuring that benefits are funded, as much as possible, by those identified by Congress as principally responsible.

*Id*. at 171-172 (footnote omitted). Moreover, the Supreme Court concluded that failing to assign a beneficiary to the responsible coal operator would shift an unintended number of beneficiaries to the "unassigned" category, which Congress intended to reserve for those beneficiaries without *any* former employer still in business, so-called "true orphans." The Supreme Court explained:

> On October 8, 1992, on the heels of the Conference Committee Report on the Act and just before the vote in the Senate adopting the Act, Senator Wallop gave a detailed explanation of the Coal Act's provisions for unassigned beneficiaries, which assumed that the "unassigned" would be true orphans:
>
> > "As a practical matter, not all beneficiaries can be assigned to a specific last signatory operator, related person or assigned operator for payment purposes. This is because in some instances, none of those persons remain in business, even as defined to include non-mining related businesses. Thus, provisions are made for unassigned beneficiary premiums." 138 Cong. Rec. 34003 (1992).
>
> The Senator's report says that the transfer to the Combined Fund from the UMWA Pension Plan and AML Fund would be made because "unassigned beneficiaries were not employed by the assigned operators at the time of their retirement.... [I]f no operator remains in business under the formulations described above, that retiree becomes an unassigned beneficiary . . . . [The Coal Act's] purpose is to assure that any beneficiary, once assigned, remains the responsibility of a particular operator, and that the number of unassigned beneficiaries is kept to an absolute minimum."

*Barnhart*, 537 U.S. at 165.

In this case, the analysis in *Barnhart* holds firm. Invalidating the SSA's reassignments would undermine Congress's stated intent to "identify persons most responsible for plan liabilities."

Energy Policy Act of 1992, Pub. L. 102-486, § 19142, 106 Stat. 3037 (1992).  If these operators' former employees simply fall into the unassigned category, the costs of those retirees' benefits will be borne by coal operators that *never employed* the retirees despite a former employer's solvency. *See Nell Jean Indus. v. Barnhart*, 224 F. Supp. 2d 10, 24 (D.D.C. 2002) ("By providing an elaborate set of assignment criteria and control group liability, Congress cast a wide net to capture as many responsible parties as possible to hold accountable for retiree benefits. Only those retirees whose former employers (and their related persons) no longer exist are left unassigned.").

Given Congress's stated purpose in enacting the Coal Act—to identify persons most responsible for plan liabilities—the SSA's construction of the statute post-*Eastern Enterprises* effectuated this intent by reassigning the *Eastern* beneficiaries to the most responsible operator, as opposed to stretching the unassigned category to cover non-"orphaned" beneficiaries.  Other courts have found similarly.  *See Pittston Co. v. United States*, 368 F.3d 385, 404-05 (4th Cir. 2004) (considering the "legislative intent expressed by Congress to minimize the number of unassigned beneficiaries by assigning each retiree to a coal operator most responsible for providing benefits," and holding that the reassignment of *Eastern* beneficiaries to Pittston, the company that had employed them the longest, was a permissible action on the Commissioner's part because doing so fulfilled this legislative intent); *see also Elgin Nat'l Indus., Inc. v. Barnhart*, Nos. 04-5243 and 04-7094, 2005 U.S. App. LEXIS 7361, at *1 (D.C. Cir. Apr. 27, 2005) (unpublished) ("Elgin's argument pertaining to the reassignment of beneficiaries after Eastern Enterprises is rejected for the reasons set forth in *Pittston Co. v. United States*, 368 F.3d 385, 401-05 (4th Cir. 2004)."); *Wheeling Pittsburgh Steel Corp. v. Barnhart*, 229 F. Supp. 2d 539, 554 (N.D. W.Va. 2002) ("[T]he Commissioner had the authority to reassign beneficiaries in response to the *Eastern Enterprises* [decision] and, thus, did not act in an arbitrary and capricious manner but, *rather,* acted within the bounds of the law.").

In sum, the SSA permissibly construed the statute when it assigned *Eastern* beneficiaries to Massey and its subsidiaries on the grounds that these coal operators had employed the retirees for the longest period of time and had signed the requisite NBCWA's.  The Supreme Court's ruling in *Eastern Enterprises* left an unprovided for situation in its wake, and the SSA's actions in response thereto effectuated the Coal Act's intent:  to assign as many beneficiaries as possible to the most responsible coal operator.  Because at least one of these beneficiaries' employers is still in operation (Massey and/or a subsidiary), they are not "true orphans" and thus should not be classified as "unassigned beneficiaries."  A contrary holding would allow Plaintiffs-Appellees to shirk their responsibility and would directly contravene the Coal Act's stated purpose.  The Coal Act's plain language does not forbid the SSA's construction thereof, and the statute's legislative intent, as well as the retroactive nature of the *Eastern Enterprises* decision itself, supports a conclusion that the SSA's interpretation was a permissible one.

## CONCLUSION AND RECOMMENDATION

We **AFFIRM** the district court's denial of the SSA's motion to transfer venue and agree with the district court that venue was properly in the Eastern District of Kentucky.  The district court's judgment with regard to the Coal Act is hereby **REVERSED**.