[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 15, 2007
THOMAS K. KAHN
CLERK

No. 06-15255
_____

D.C. Docket No. 04-00065-CV-HS-S

UNITED STATES STEEL CORPORATION,
U.S. STEEL MINING COMPANY, LLC,

Plaintiffs–Appellants,

versus

MICHAEL J. ASTRUE,[*]
Commissioner of Social Security Administration,

Defendant–Appellee,

MICHAEL H. HOLLAND,
ELLIOT A. SEGAL,
WILLIAM P. HOBGOOD, et al.,

Intervenors.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(August 15, 2007)**

---

[*]Pursuant to Fed. R. App. P. 43(c), Michael J. Astrue is substituted for his predecessor, Jo Anne B. Barnhart, as Commissioner of the Social Security Administration.

Before DUBINA and BLACK, Circuit Judges, and RESTANI,[**] Judge.

RESTANI, Judge:

United States Steel Corporation ("USS") and its subsidiary, United States Steel Mining Company ("USSM") (collectively "Appellants"), brought this action against the Commissioner of the Social Security Administration ("SSA"), under the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701–08, 9711–12, 9721–22 ("Coal Act"), challenging the SSA's assignment of various United Mine Workers of America ("UMWA") retirees to them for health care premium payments. The district court granted summary judgment against Appellants on all claims. On appeal, Appellants argue that the SSA improperly withheld requested earnings records for certain miners, incorrectly found that another responsible coal operator was not "in business" for purposes of the Coal Act, incorrectly applied a rebuttable presumption in assigning three miners to Appellants, and improperly assigned to Appellants miners who had become unassigned following the Supreme Court's holding in Eastern Enterprises v. Apfel, 524 U.S. 498 (1998). We AFFIRM the district court's order with respect to the request for earnings records, the assignment of two of the three miners to Appellants based upon a rebuttable presumption, and the

[**]Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

2

assignment of miners who became unassigned following Eastern Enterprises. We REVERSE the district court's judgment upholding the assignment of one of the three miners, Lee Jones, to Appellants based upon a rebuttable presumption, and with respect to eleven of the fifteen miners assigned to Appellants based upon a finding that another responsible coal operator was not "in business" for purposes of the Coal Act. We REMAND with respect to four of the fifteen miners whose employment with the other responsible coal operator is contested.

## BACKGROUND

### I.    The Coal Act

The Coal Act of 1992 was "the culmination of a long history involving bituminous coal companies . . ., the United Mine Workers of America . . . , and collective bargaining agreements between them." Pittston Co. v. United States, 368 F.3d 385, 390 (4th Cir. 2004). In 1947, the Bituminous Coal Operators' Association ("BCOA") and the UMWA negotiated the first National Bituminous Coal Wage Agreement ("NBCWA"), creating a trust fund to provide pension plans and medical benefits to retired coal miners and their families. Sidney Coal Co. v. SSA, 427 F.3d 336, 338 (6th Cir. 2005). In 1950, the trust fund became a multi-employer trust which was "funded by coal operators with royalties paid in proportion to the operators' coal production." Pittston, 368 F.3d at 390. The trust did not provide a

3

consistent level of benefits. Sidney, 427 F.3d at 338.

As a result, in 1974, the UMWA and the BCOA entered into another NBCWA, replacing the prior trust fund with four separate trusts which were "funded by royalties on coal production and premiums based on employee hours." Pittston, 368 F.3d at 391. The 1974 NBCWA was "the first agreement between the UMWA and the BCOA to expressly reference health benefits for retirees." E. Enters., 524 U.S. at 509. The trust funds, however, began to experience financial difficulties and thus, in 1978, another agreement was made "assign[ing] responsibility to signatory coal operators for the healthcare of all of their own current and former employees." Pittston, 368 F.3d at 391. Despite such actions, the trust funds continued to experience financial difficulties and were modified again in 1988. Id.

In 1992, Congress enacted the Coal Act to preserve benefits for UMWA retirees. E. Enters., 524 U.S. at 511–14. Specifically, the Coal Act created the United Mine Workers of America Combined Benefit Fund ("Combined Fund"), which provided lifetime health benefits to retirees and their dependents. Id. at 514. The Combined Fund is financed by annual premiums assessed against coal operators who had signed "any NBCWA or any other agreement requiring contributions to the 1950 or 1974 Benefit Plans." Id. (citing 26 U.S.C. § 9701(b)(1), (3), § 9701(c)(1)). "The amount owed in premiums depended on the number of retirees and dependents for

4

which each signatory operator was responsible." Sidney, 427 F.3d at 339 (citing 26 U.S.C. § 9704(a)(1)–(3)). Any of these signatory coal operators "who 'conducts or derives revenue from any business activity, whether or not in the coal industry,' may be liable for those premiums." E. Enters., 524 U.S. at 514 (citing 26 U.S.C. §§ 9706(a), 9701(c)(7)). If "a signatory is no longer involved in any business activity, premiums may be levied against 'related person[s],' including successors in interest and businesses or corporations under common control." Id. (citing 26 U.S.C. §§ 9706(a), 9701(c)(2)(A)).

The Act instructs the SSA to assign retirees to operators using the following formula:

1) to the operator which "was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement," and which "was the most recent signatory operator to employ the coal industry retiree . . . for at least two years;"

2) if unassignable under the first step, then to the operator which "was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement," and which "was the most recent signatory operator to employ the coal industry retiree in the coal industry;" and

3) if unassignable under the first two steps, then "to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of

5

time than any other signatory operator prior to the effective date of the 1978 coal wage agreement." 26 U.S.C. § 9706(a).

If an eligible beneficiary cannot be assigned under any of these steps, the beneficiary is considered "unassigned," and his benefits are funded through asset transfers from the 1950 National Bituminous Coal Wage Agreement Fund or the Abandoned Mine Land Reclamation Fund. Sidney, 427 F.3d at 340 (citing 26 U.S.C. § 9705(a)–(b)). If the asset transfers are insufficient, then the unassigned miners' benefits are funded though premiums assessed against all assigned operators. 26 U.S.C. §§ 9704(d).

## II.    The Supreme Court's Decision in Eastern Enterprises

In Eastern Enterprises, the Supreme Court held that the third step of § 9706, assigning retirees to operators which had signed wage agreements prior to 1974 but had not signed the 1974 NBCWA or a subsequent coal wage agreement promising lifetime benefits, was unconstitutional.[1] E. Enters., 524 U.S. at 530, 537. A majority of the Court concluded that such assignments were unconstitutional because they retroactively required premium payments from coal operators that had not signed any agreements promising lifetime benefits for their employees, and because such

---

[1]The Supreme Court identified the 1974 NBCWA as the first coal wage agreement promising lifetime benefits to miners. E. Enters., 524 U.S. at 509, 530, 535.

operators did not have sufficient notice that lifetime benefits would be required later. Id. at 535–36. A plurality of the court concluded that such assignments amounted to an unconstitutional taking because they "forced [such operators] to bear the expense of lifetime health benefits for miners based on [their] activities decades before those benefits were promised." Id. at 537.

After the Supreme Court's decision, the SSA invalidated all assignments to coal operators that had not signed the 1974 NBCWA or a later agreement. Sidney, 427 F.3d at 341. The SSA then assigned those miners to operators "that had employed the retired miners for the longest period and to whom it was constitutional to make assignments under § 9706, i.e., only those coal operators that had signed a 1974 NBCWA or later agreement and that remained in business." Id.

## III.    Factual & Procedural Background[2]

The current case arises from various assignments of miners to Appellants by the SSA.

1993 Assignments

On September 28 and October 7, 8, 15, 16, and 18, 1993, SSA service centers sent letters to Appellants assigning miners to them under the Coal Act. Each letter

---

[2]Unless otherwise noted, the facts here are taken from the memorandum of decision of the district court. See United States Steel Corp. v. Barnhart, No. 04-0065, 2006 U.S. Dist. LEXIS 94798, at *16–*59 (N.D. Ala. June 20, 2006). The parties do not appear to contest these facts.

stated that operators had thirty days upon receipt of the letter to either request further information about the assigned miners or to request a review. The letters also stated that if an operator requested further information about the miners, it would have thirty days from receipt of those records to request a review of the assignment.

On October 8, 1993, Darrell Lilly ("Lilly"), the human resources manager for USSM, sent letters to the SSA requesting the earnings records of, and the basis of assignments for, miners assigned on September 28th. On October 26, 1993, Lilly sent similar letters to the SSA requesting similar information concerning the October 7th and 8th assignments. The letters from Lilly were written on USSM letterhead and indicated that USSM was a subsidiary of USS, then referred to as USX, but did not mention any specific miners or assignments made to USS or USSM. In response, in letters dated February 7, 23, and 28, and March 1 and 2, 1994, the SSA sent Lilly the earnings records for various miners assigned to Appellants.

On March 15, 1994, Lilly sent letters to the SSA stating that "we are asking you to review the assignment per the attached list. We have not received an Itemized Statement of Earnings for these individuals. Therefore, we must disagree with the assignment that U.S. Steel Mining Co. is the responsibility (sic) operator." U.S. Steel Corp., 2006 U.S. Dist. LEXIS 94798, at *19. Although the letters referenced only USSM, the list attached to each letter included miners assigned to both USS and

8

USSM. In response, in letters dated March 31, and April 13 and 15, 1994, the SSA sent Lilly the requested earnings records and basis of assignment.

The letter dated March 31, 1994, however, also stated that the SSA had not enclosed the earnings records for eight particular miners but that it would send the information later. The records were not sent. Appellants now seek the records for five of the eight miners listed that were assigned to USS on October 18, 1993.

1995 Assignments

On June 30 and September 20, 1995, the SSA sent notices to Appellants assigning them additional miners. On September 29, 1995, Lilly sent a letter to the SSA requesting the earnings records of the miners assigned to USSM on September 20th. On November 20, 1995, the SSA acknowledged receipt of the request. Lilly replied, stating that he had intended to request the earnings records for miners assigned to USS and USSM. The SSA responded by sending USS the records for miners assigned to it in June, rather than September, 1995. Appellants now seek the correct records from the SSA.

1998–2001 Assignments

The SSA again issued notices in 1998, 1999, 2000, and 2001, assigning additional miners to Appellants. The assignments included miners who had been initially assigned to operators that had not signed the 1974 NBCWA or any

9

subsequent coal wage agreements, and miners who had been employed longer by Black Diamond Coal Company ("Black Diamond") than by Appellants. Appellants requested review of seventy-eight of these assignments. The SSA reviewed the assignments and issued a final decision ruling that the Appellants were responsible for some, but not all, of the miners.

Procedural History

Appellants brought the underlying suit on January 12, 2004.[3] On August 5, 2005, the SSA filed a motion to dismiss, or in the alternative, for summary judgment. Appellants responded by filing a motion for summary judgment on most counts of their claim and also asked the court to defer consideration of counts IV, V, and VII so that they could conduct discovery. The court granted Appellant's motion to defer consideration of counts IV, V, and VII. The court then granted summary judgment to the SSA on the nondeferred counts and the deferred counts were dismissed subsequently.

Appellants appeal on four grounds. First, Appellants argue that the SSA acted improperly when it failed to furnish the earnings records for five miners assigned to USSM in 1993 and for twenty-nine miners assigned to USS in September 1995.

---

[3]The Trustees of the UMWA intervened as party defendants with respect to Appellants' challenge of the assignment of miners affected by Eastern Enterprises.

Second, Appellants contest the assignment to USS of miners who had worked longer for Black Diamond than for USS. Appellants argue that those miners should have been assigned instead to Argyle Investments ("Argyle"), which was Black Diamond's parent company and which is still "in business" for purposes of the Coal Act. Third, Appellants argue that the SSA incorrectly assigned to Appellants three miners that they had not employed in the coal industry. Appellants essentially claim that the SSA arbitrarily and capriciously rejected evidence submitted showing that those miners had not worked in Appellants' coal operations. Finally, Appellants challenge the SSA's assignment of miners who had become unassigned following the Supreme Court's holding in Eastern Enterprises.

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction under 28 U.S.C. § 1331. We review a grant of summary judgment de novo, "applying the same standard as the district court." Mahon v. U.S. Dep't of Agric., 485 F.3d 1247, 1252 (11th Cir. 2007). The summary judgment procedure is particularly appropriate in cases such as this, "in which a district court is asked to review a decision rendered by a federal administrative agency." Id. at 1253.

"[E]ven in the context of summary judgment," however, "an agency action is entitled to great deference." Preserve Endangered Areas of Cobb's History, Inc. v.

U.S. Army Corps of Eng'rs, 87 F.3d 1242, 1246 (11th Cir. 1996). We will uphold an agency action unless it is contrary to law, an abuse of discretion, or arbitrary and capricious. 5 U.S.C. § 706(2)(A). We "may not substitute [our] judgment for that of the agency and can set aside an agency's decision only if the agency relied on improper factors, failed to consider important relevant factors, or committed a clear error of judgment that lacks a rational connection between the facts found and the choice made." Arango v. U.S. Dep't of the Treasury, 115 F.3d 922, 928 (11th Cir. 1997) (internal quotation marks & citations omitted).

**DISCUSSION**

I.    **Failure to Furnish Earnings Records**

When a coal operator receives notice assigning beneficiaries, it "may, within 30 days of receipt of such notice, request from the [SSA] detailed information as to the work history of the beneficiary and the basis of the assignment." 26 U.S.C. § 9706(f)(1). After receiving the requested materials, the operator "may, within 30 days of receipt of the information . . ., request review of the assignment." Id. § 9706(f)(2). If the operator does not request additional information, it may request review of the assignment within 30 days from receipt of the notice of assignment. 20 C.F.R. § 422.605. When a review is completed, the SSA's decision is final. 26 U.S.C. § 9706(f)(4). Here, Appellants claim that the SSA failed to furnish them with

12

the requested earnings records for miners on two separate occasions. They seek an order instructing the SSA to furnish those records now.

Appellants claim that the SSA neglected to send them the requested earnings records for five miners assigned to them in October 1993. Appellants did not produce any copies of such a request, but instead rely upon a letter from the SSA to show that they had made the request. The letter, dated March 31, 1994, states:

> We are writing you about the miners assigned to you under the Coal Industry Retiree Health Benefit Act of 1992. As you requested, enclosed are the earnings record(s) and the basis for the assignment(s) for the miner(s) for whom you requested such information.

Letter from Frank J. Hagel, Assistant Regional Commissioner, Western Program Service Center, SSA, to USX Corporation (Mar. 31, 1994). Several pages later, the letter continues, stating:

> Below we identify the retired coal miner(s) whose earnings record(s) is not enclosed. We will send you the earnings record(s) and the basis for the assignment(s) later.

Id. The letter then listed the five miners in question.

Appellants argue that the latter two sentences of the letter establish that they had requested the records at issue. The SSA argues otherwise, reasoning that its letter does not establish that Appellants had made a timely request for records because the SSA may have "inadvertently" included the five miners in the letter, "mistakenly

13

thinking they were a part of [Appellants'] request[s]." (Appellee's Br. 25.) Regardless of whether Appellants had made the request, their claims are barred by the statute of limitations.

Because this claim for review is brought under the APA and the Coal Act does not provide a statute of limitations, this action is barred unless filed within six years of the final agency action. 28 U.S.C. § 2401(a); Ctr. for Biological Diversity v. Hamilton, 453 F.3d 1331, 1334 (11th Cir. 2006) ("[When] the Act prescribes no statute of limitations, [] the general six-year statute of limitations for suits against the United States applies."); USX Corp. v. Barnhart, 395 F.3d 161, 166 (3d Cir. 2004) (recognizing a six-year statute of limitations on claims filed under the Coal Act). The statute of limitations period begins to run once the agency has issued a "final action." 5 U.S.C. § 704; Ga. Power Co. v. Teleport Commc'ns Atlanta, Inc., 346 F.3d 1047, 1050 (11th Cir. 2003) ("Only final agency actions can be subject to judicial review."); Trafalgar Capital Assocs., Inc. v. Cuomo, 159 F.3d 21, 35 (1st Cir. 1998) (referring to the final agency action that commenced the statute of limitations). To be considered "final," an agency's action: (1) "must mark the consummation of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature;" and (2) "must be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S.

154, 177–78 (1997) (internal citations & quotations omitted).

Here, the assignment of the beneficiaries to Appellants is the final agency action for purposes of § 2401(a). First, the assignment of miners is not tentative or interlocutory in nature, but instead is a definitive decision to attribute responsibility for beneficiaries to operators. Second, once assignments are made, the operator must "pay the premiums attributable to the challenged assignments or incur the penalties for failure to make those payments," regardless of whether the operator seeks administrative review of the assignments. Dixie Fuel Co. v. Commn'r of SSA, 171 F.3d 1052, 1058 (6th Cir. 1999) (overturned on other grounds by Barnhart v. Peabody Coal Co., 537 U.S. 149, 168 (2003)). Thus, the requirements to be considered a final agency action are met here.

Appellants argue that the assignment of miners is not the relevant final agency action. Appellants argue instead that because they seek only information regarding the miners assigned, the relevant last action is the SSA's failure to respond to their request for information, and this failure to act does not constitute a final agency action for purposes of § 2401(a). Whether Appellants seek information regarding the assignment or seek review of the assignments, however, Appellants have suffered a final agency action that has adversely affected them, as they have been obliged to pay premiums since the initial assignment. See Dixie Fuel, 171 F.3d at 1058. Further,

15

a request for information regarding an assignment does not relieve Appellants of the obligation to proceed in a timely manner. Rather, a request for information is merely "an avenue that an assigned operator may take to obtain review of the factual basis for the assignment of particular beneficiaries." Id. at 1059. Thus, we hold that the statute of limitations for Appellants' claim ran from the date of the initial assignment.

Here, the assignment of the miners at issue in 1993 was a final agency action that began the statute of limitations period. Appellants did not bring the current action until 2004. Nothing occurred which arguably could have tolled the statute of limitations for a sufficient length of time to prevent its expiration. Likewise, the statute of limitations has run on the Appellants' request for the records of the miners assigned in 1995. In that instance, Appellants claim that the SSA sent them the records for the wrong miners, and that they now seek the proper records from the SSA. The records were sent in 1996, but Appellants did not realize until 2002 that they had not received the proper records. Appellants should have checked the records much earlier and have no excuse for not doing so.[4] As Appellants did not bring suit until 2004, the statute of limitations has run.

Accordingly, we affirm the district court's grant of summary judgment against

---

[4]We can conceive of the possibility of erroneous information misleading the assignee in such a way that the erroneous information could not be discovered in a timely fashion, but that is not the issue at hand.

Appellants on their request to order the SSA to furnish the earnings records for certain miners assigned in 1993 and in 1995.

## II.      Failure to Assign Miners to Related Persons

Appellants also challenge the assignment of fifteen miners who had worked longer for Black Diamond than for them.  Appellants acknowledge that the SSA could not have assigned these miners to Black Diamond, because it went out of business before the initial assignments were made.[5]  Appellants, however, argue that the SSA should have assigned the miners to Argyle, which was a "related person"[6] to Black Diamond.

In a review decision given to Appellants, the SSA found that Argyle was Black Diamond's parent company and that the two were related for purposes of the Coal Act.  SSA Great Lakes Program Serv. Ctr., Coal Act Review Determination 6 (1998).

---

[5]The Coal Act requires the SSA to "assign each coal industry retiree who is an eligible beneficiary to a signatory operator which (or any related person with respect to which) remains in business."  26 U.S.C. § 9706(a).

[6]The Coal Act defines "related persons" as:
(i) a member of the controlled group of corporations . . . which includes such signatory operator;
(ii) a trade or business which is under common control . . . with such signatory operator; or
(iii) any other person who is identified as having a partnership interest or joint venture with a signatory operator in a business within the coal industry, but only if such business employed eligible beneficiaries, except that this clause shall not apply to a person whose only interest is as a limited partner.

26 U.S.C. § 9701(c)(2)(A).

17

The SSA, however, held that it could not assign the miners in question to Argyle because it was not "in business" for purposes of the Coal Act. Id. at 7. The SSA concluded that Argyle had not been in business since 1996 because it became a holding company, no longer paid wages to employees, sold most of its real property, hired a real estate management company to administer its remaining parcel of rental property, transferred the administration of its investment portfolio to a bank, and received only "passive income" from rent and investments. Id. at 6–7. The parties agree that Argyle was Black Diamond's parent corporation and do not appear to contest that Argyle and Black Diamond are "related." Thus, the issue is whether or not Argyle is "in business" within the meaning of the Coal Act.

Under the Coal Act, "a person shall be considered to be in business if such person conducts or derives revenue from any business activity, whether or not in the coal industry." 26 U.S.C. § 9701(c)(7). We agree with our sister courts that this is a broad definition, "including within its scope not only (1) an entity that 'conducts' business activity, but also (2) one who 'derives revenue' from business activity." Lindsey Coal Mining Co. v. Chater, 90 F.3d 688, 692 (3d Cir. 1996) (stating that because "the 'conducts' prong is provided for separately, the 'derives revenue' prong does not require the party liable under the Coal Act to itself 'conduct' a business activity"); Dist. 29, United Mine Workers of Am. v. United Mine Workers of Am.

1992 Benefit Plan, 179 F.3d 141, 145 (4th Cir. 1999) ("The Act employs an expansive definition of 'in business' that includes 'conducting or deriving revenue from any business activity, whether or not in the coal industry.'") (quoting 26 U.S.C. § 9701(c)(7)) (emphasis removed).

There is no dispute here that Argyle is "deriving revenue." That is, Argyle still owns a parcel of property from which it receives rental income and has an investment portfolio of cash and publicly traded stocks, bonds, and notes from which it receives interest. Although Argyle is clearly deriving revenue from various sources, the SSA argues that it is not deriving revenue from "business activities" because it transferred the management of its rental property to a real estate management company and the administration of its investment portfolio to a bank. The SSA essentially claims that "business activity" does not include "passive" ownership of revenue-generating assets, but must entail at least the management of the assets.[7]

The SSA's interpretation is contrary to legislative intent. As Lindsey Coal indicates, Congress intended for the definition of "in business" to be interpreted broadly. Lindsey, 90 F.3d at 692. Particularly persuasive was the following

---

[7]In finding that Argyle was not in business since 1996, the SSA focused on the fact that Argyle has not paid wages to any employees since that time. There is no indication, however, that the payment of wages is a determinative factor for deciding whether or not a company is "in business" for purposes of the Act.

exchange between Senator Bentsen, then Chairman of the Senate Finance Committee, and Senator Rockefeller, a principal architect of the legislation:

> Mr. BENTSEN: That definition of [business activity] has alternative tests: a company is considered to be in business if it either conducts a business activity or "derives revenue from" a business activity. As is apparent from the existence of the two tests, the intention of the legislation is to define the term "in business" broadly.
> . . . .
> Even in cases where a company is not considered to conduct a business of its own, if the company has leased any of its property in return for the right to receive royalties based on the use of the property in a business operated by the lessee, the company would be considered to "derive revenue from" the business activity conducted by the lessee.
> Mr. ROCKEFELLER. Mr. President, again I agree with the chairman of the Finance Committee. The language of the statute is purposely broad. Certainly, a company would be considered to be in business if it continued to own significant properties and has leased some of those properties so that it may derive revenue from the business operation of the leased properties by the lessee.

138 Cong. Rec. 34,034–35 (1992).

It appears from this that a wide variety of revenue-generating activities, including owning and leasing property, would cause a company to be considered "in business" within the meaning of the Act. There is no indication that Congress meant to define certain phrases within the definition of "in business," such as "business activity," narrowly. Doing so would undermine the overall broad meaning of the statute, allowing companies to escape liability under the Act by framing their revenue-generating activities as "passive" business activities. The legislative intent

to construe "in business" broadly counsels us instead to consider the ownership of revenue-generating property, investments, and other assets as "business activity" within the meaning of the Coal Act.  See Lindsey, 90 F.3d at 692 (holding that a company that derived revenue from leasing its property was "in business" for purposes for the Coal Act); Dist. 29, 179 F.3d at 145 (holding that a company that had constructive possession over its revenue-generating assets remains "in business" within the meaning of the Act); United Mine Workers of Am. 1992 Benefit Plan v. Rushton (In re Sunnyside Coal Co.), 146 F.3d 1273, 1279–80 (10th Cir. 1998) (holding that a company that entered into liquidation remains in business for purposes of the Act); Wheeling-Pittsburgh Steel Corp. v. Barnhart, 229 F. Supp. 2d 539, 553 (N.D.W. Va. 2002) (holding that a company that generated revenue from the sale of its assets remained "in business").

As previously stated, the parties do not contest that Argyle is still receiving revenue from its leased property and its investment portfolio.  That Argyle chose to delegate management of its property and other assets to third parties does not relieve it from liability for premiums owed under the Act.  Thus, we hold that Argyle is "in business" for purposes of the statute.  Accordingly, we will reverse the judgment of the district court and remand for the district court to order the SSA to rescind the assignment to Appellants of eleven of the fifteen miners at issue that indisputably had

21

worked for Black Diamond longer than for Appellants.[8]

## III.    Rebuttable Presumption

Appellants also challenge the review decisions upholding the assignment of three miners, Lee Jones, Victor Hribar, and Woodrow Stewart. Specifically, Appellants assert that the SSA misapplied a rebuttable presumption that a miner was employed in the coal industry by a signatory operator "to deny the appeal of an operator who has shown that there are no records . . . show[ing] that the miner had worked for that operator in the coal industry." (Appellants' Br. 37.)

Preliminarily, administrative agencies may establish presumptions, "as long as there is a rational nexus between the proven facts and the presumed facts." Cole v. U.S. Dep't of Agric., 33 F.3d 1263, 1267 (11th Cir. 1994); Sec'y of Labor v. Keystone Coal Mining Corp., 151 F.3d 1096, 1100-01 (D.C. Cir. 1998) (stating that presumptions are permissible "if there is 'a sound and rational connection between the proved and inferred facts'") (quoting Chem. Mfrs. Ass'n v. Dep't of Transp., 105 F.3d 702, 705 (D.C. Cir. 1997)). "Appellants bear 'the heavy burden of demonstrating that there is no rational connection between the fact proved and the

---

[8]The SSA also claims that Appellants did not allege in their request for review, and employment records do not support the conclusion, that four of the fifteen miners at issue, McNeel, Knott, Kendrick and Shaw, had worked for Black Diamond. (Appellee's Br. 34 n.14.) The SSA argues that if the court remands this claim, it should exclude these four miners from reconsideration. Because the district court disposed of this issue in the SSA's favor on legal grounds, the SSA may now address this factual issue before the district court.

22

ultimate fact to be presumed.'" USX Corp., 395 F.3d at 170 (quoting Cole, 33 F.3d at 1267).

Here, when assigning beneficiaries to coal operators, the SSA examines its earnings records, which identify the employers of each beneficiary but not the nature of the employment. Instead of showing that a worker was employed specifically in the coal industry, the SSA employs a rebuttable presumption that

> a [beneficiary] who otherwise qualified for benefits under the Coal Act was "employed in the coal industry" for purposes of 26 U.S.C. § 9706(a) if (1) his employer was a coal mine operator that signed a national coal wage agreement and (2) his employment occurred during the employer's participation in the national coal wage agreement.

Id.

We agree with our sister circuit that it is a reasonable inference that a beneficiary's earnings from a coal operator, which are posted to the SSA's earnings records, were for work in the coal industry. See id. at 172. Further, as the Third Circuit noted, the SSA's "rebuttable presumption is a sensible response" to the difficulty of locating records that the worker was employed specifically in the coal industry as the "beneficiaries' personnel files can date back fifty to sixty years, and even a [worker]'s own employer can have difficulty retrieving them." Id. (citing Panduit Corp. v. All States Plastic Mfg. Co., 744 F.2d 1564, 1581 (Fed Cir. 1984) ("Presumptions of fact have been created to assist in certain circumstances where

23

direct proof of a matter is . . . rendered difficult.") (<u>overruled on other grounds by</u> <u>Richardson-Merrell, Inc. v. Koller</u>, 472 U.S. 424, 432 (1985)). Moreover, if a worker was not employed in the coal industry, the coal operator is in a position to correct the misapprehension. <u>Id.</u>

The parties here disagree on what occurs when an operator presents evidence rebutting the presumption. Appellants claim that, like employment discrimination cases, a presumption shifts the burden of going forward with evidence but does not shift the burden of proof. <u>See</u> <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1024 (11th Cir. 2000) (stating that an employer only needs to produce evidence rebutting a presumption of discrimination, but that the burden of persuasion remains on the employee to prove that he was a victim of intentional discrimination). According to Appellants, the SSA can use the presumption to make the initial assignments but cannot use the presumption to support a denial of an appeal or if an operator has presented evidence rebutting the presumption. In contrast, the SSA claims that the presumption can be used during the review process and that the framework for applying rebuttable presumptions in discrimination cases does not apply to this case. (Appellee's Br. 49.)

We agree with the SSA and the district court that it is reasonable for the presumption to stand during a review of an assignment. The Coal Act provides that

24

if an operator disagrees with an initial assignment, it can seek review of the assignment by providing evidence showing a "prima facie case of error." 26 U.S.C. § 9706(f)(2). Thus, it is during a review that an operator may offer sufficient evidence to rebut the presumption.

Sufficient evidence is "the kind of evidence a reasonable mind might accept as adequate to support a conclusion." Conoco, Inc. v. Dir., Office of Workers' Comp. Programs, 194 F.3d 684, 690 (5th Cir. 1999) (quoting Noble Drilling Co. v. Drake, 795 F.2d 478, 481 (5th Cir. 1986) (abrogated on other grounds by Dir., Office of Workers' Comp. Programs v. Greenwich Collieries, 512 U.S. 267 (1994)). The evidence must merely "raise[] a genuine issue of fact as to whether" the operator employed the beneficiary in the coal industry. Chapman, 229 F.3d at 1024 (citations & quotation marks omitted). If the operator cannot present such evidence, the presumption stands. Once an operator presents sufficient evidence rebutting the presumption, however, the SSA must then show that the beneficiary has worked in the coal industry for the operator.[9] See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502,

_____

[9]The SSA does not present a convincing argument as to why the framework for applying presumptions in discrimination cases has no utility here.
The SSA argues that this case is unlike discrimination cases for which courts developed the framework for applying presumptions as a response to "the difficult task of discerning the defendant's motive." (Appellee's Br. 49.) The rationale for applying the presumption, however, is similar to the rationale for applying presumptions in discrimination cases. Like discrimination cases, the presumption here is used in response to the difficulty of locating direct evidence, i.e., fifty-or sixty-year-old employment records showing that an operator employed a beneficiary in

25

507–08 (1993) (stating that in employment discrimination cases, once a defendant has rebutted the presumption that it had discriminatory motives for its actions, the plaintiff then has the burden of persuasion to show that he was a victim of intentional discrimination); Chapman, 229 F.3d at 1024–25 (same).

Here, the SSA apparently found that Appellants did not produce sufficient evidence to rebut the presumption that Lee Jones, Victor Hribar, and Woodrow Stewart worked for them in the coal industry. We review the SSA's decisions under an arbitrary and capricious standard.

### A. Lee Jones

Appellants contend that Jones worked in an oil well warehouse rather than in a coal mine. In support, Appellants submitted an affidavit from a USS representative stating that he spoke with Jones' nephew, Vincent Coleman, who spoke with his aunt, Jones' widow. (Dimmock Aff. ¶ 3, July 9, 1999.) She informed her nephew that she did not recall her husband ever working in a coal mine for Appellants. (Id.) Jones' nephew further stated that his aunt and her husband lived in Charleston, West Virginia, during his employment with USS. (Id.) Appellants then submitted an affidavit stating that they did not own any coal mines in Charleston, West Virginia,

---

the coal industry. USX, 395 F.3d at 172. Once there is actual rebutting evidence, however, it cannot be ignored.

during the relevant time period. (Boskovich Aff. ¶ 4, July 9, 1999.) Appellants also submitted a list of USS facilities from the 1950s showing that there was an oil well warehouse in Charleston at that time and that the closest coal mine was 134 miles away. See Barnhart, 2006 U.S. Dist. LEXIS 94798, at *57 n.15. Appellants argue that it was not possible for Jones to have commuted to work at any of the mines that USS owned in West Virginia, and that Jones must instead have worked at USS' oil well warehouse.

Upon request for review, the SSA rejected Appellants' argument. The SSA found that Jones worked for USS during the period at issue, that Jones had not worked for any other coal industry employer after working for USS, and that USS was a signatory to a coal wage agreement for the periods shown. Id. at *50. Based on this, the SSA concluded that the Appellants were the last signatory operators still in business to employ Jones in the coal industry under a coal wage agreement.

Despite the deferential standard with which we review decisions of the SSA, there must be a "rational connection between the facts found and the choice made." Arango, 115 F.3d at 928 (citation & quotation marks omitted). Here, there is no rational connection between the SSA's denial and the evidence with which it was

presented.[10]  The evidence here, that Jones' widow did not recall him ever working in a coal mine, that Jones lived in Charleston, West Virginia, and that the closest coal mine to Charleston was 134 miles away, supports the conclusion that Jones did not work in the coal industry for Appellants.[11]  The SSA, however, did not address this evidence but merely repeated the factors leading to the application of the presumption.  As Appellants had presented evidence to rebut SSA's presumption, the SSA cannot point to the presumption itself to refute the rebuttal.  In so doing, the SSA acted arbitrarily and capriciously.  Accordingly, we reverse the order of the district court and remand for the district court to order the SSA to rescind the assignment of Jones to Appellants.

## B.    Victor Hribar

Appellants also claim that Hribar did not work for Appellants or a related company in a position that would qualify for NBCWA benefits.  Upon review before the SSA, Appellants produced evidence that the Combined Fund did not have records

---

[10]The SSA argues that employment records showing that Jones worked in an oil warehouse rather than a coal mine would be the only evidence capable of rebutting its presumption, but that is erroneous.  As previously stated, to rebut the presumption, Appellants must simply present "the kind of evidence a reasonable mind might accept as adequate to support a conclusion."  Conoco, 194 F.3d at 690.

[11]The SSA argues that its decision was not arbitrary and capricious because Jones "might have commuted during this time, working a swing shift and living in close proximity to the mines while working and returning to Charleston during [his] time off."  (Appellee's Br. 51.)  We do not give weight to council's post-hoc, unsubstantiated claim.

showing that Hribar had worked for Appellants.[12]  Instead, the Combined Fund had records showing that Hribar worked for Hillman Coal & Coke during 1952, the year that SSA records indicated that Appellants employed Hribar.  Additionally, Appellants presented evidence that one of their employees spoke to Hribar's daughter, who did not recall her father working for them but recalled him working for Hillman during the time in question.  Appellants also submitted statements from their record custodians stating that they did not find any employment records indicating that Appellants had employed Hribar.  Appellants further supported their argument with a second report generated by the SSA showing that Hribar worked for a division of Appellants constructing bridges and high-rise office buildings.

In response, the SSA noted that a microfiche copy of a page from a USS subsidiary's wage report filed with the IRS for 1952 was a reliable document showing that USS employed Hribar.  The SSA further stated that although the Combined Fund's records showed that Hribar did not report working for Appellants with the Fund, the Fund had Hribar's earnings records from the fourth quarter of 1952 showing employment with Carnegie Illinois Steel Corporation, a USS subsidiary involved in the coal industry.  The SSA responded to Appellants' production of

_____

[12]The Combined Fund apparently keeps employment records of eligible beneficiaries. See 26 U.S.C. § 9706(c).

evidence, and its conclusion that Appellants employed Hribar in the coal industry was not arbitrary or capricious. Thus, we affirm the district court's judgment as to Hribar.

### C.     Woodrow Stewart

Finally, Appellants challenge the assignment of Stewart, arguing that they did not employ him in the coal industry. Appellants submitted evidence to the SSA from the UMWA showing that it did not have any record of Stewart's employment with Appellants. Additionally, Appellants submitted an affidavit from their director of employee relations stating that they did not own any coal mines in Charleston, West Virginia, where Appellants argue that Stewart lived for most of his life. Appellants claim that Stewart lived in Charleston based upon his earning records showing employment mainly by companies in Charleston. Appellants believe that Stewart instead worked at the same oil warehouse as Jones. The SSA rejected Appellants' contentions, noting that Stewart's earnings records showed that he had worked for USS.

Although this case appears close, it does not appear that the SSA committed a clear error of judgment in denying Appellants' appeal. While Appellants presented an affidavit relaying Jones' widow's recollection stating that Jones did not work in a coal mine for them, they did not present such evidence here. Further, Appellants have not presented evidence that Stewart actually lived within Charleston during the

entire time period in question.  Rather, evidence showed that Stewart did not work, and presumably did not live, exclusively in Charleston.  Given such, we affirm the district court's judgment that the SSA properly upheld the assignment of Stewart to Appellants.[13]

## IV.   Miners Affected by Eastern Enterprises

Lastly, Appellants argue that the SSA improperly assigned them miners who had been assigned previously to operators that had not been signatories to the 1974 NBCWA or any subsequent coal wage agreements.  As previously discussed, the Supreme Court held in Eastern Enterprises that the imposition of liability for premiums upon companies who were not signatories to the 1974 NBCWA, or a subsequent coal wage agreement, is unconstitutional.  E. Enters., 524 U.S. at 537. Miners previously assigned to such companies thus became "unassigned."  The SSA then reassigned these miners to signatory operators who had employed them the "next longest."  Appellants challenge this action, arguing that the literal language of the

[13]With respect to Hribar and Stewart, Appellants also argue that the SSA acted arbitrarily and capriciously by not following its prior practice of reversing assignments when the Combined Fund informs the SSA that the work at issue "was not covered earnings."  (Appellants' Br. 36 n.5.)  Appellants, however, have provided no legal authority to support their argument, nor have they elaborated upon the prior instances in which the SSA reversed an assignment based upon the Combined Fund's lack of records showing a beneficiary's employment with an operator.  (Id.) We will not address this perfunctory and underdeveloped argument.  See Flanigan's Enters., Inc. v. Fulton County, Ga., 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument); Ordower v. Feldman, 826 F.2d 1569, 1576 (7th Cir. 1987) (stating that an argument made without citation to authority is insufficient to raise an issue before the court).

Coal Act precludes "reassignment" of the miners affected by Eastern Enterprises. (Appellants' Br. 43.)

As the Coal Act does not state how the SSA should handle miners who became unassigned following Eastern Enterprises, the SSA was without guidance when it "reassigned" miners to a "newly narrowed group of qualified coal operators." Sidney, 427 F.3d at 346. Hence, the issue is whether the SSA permissibly construed the Coal Act in its effort to comply with Eastern Enterprises. Id. at 346; Pittston, 368 F.3d at 402 (citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843 (1984)).

The Fourth and Sixth Circuits have addressed this matter and held that the "reassignment" of miners rendered unassigned following Eastern Enterprises was proper. Pittston, 368 F.3d at 405; Sidney, 427 F.3d at 349. In Pittston, the Fourth Circuit noted that, after Eastern Enterprises, signatory operators "include[d] only operators that had signed a 1974 NBCWA or later agreement." Pittston, 368 F.3d at 403. The court then reasoned that with the assignment to such operators deemed invalid and with a new definition of who composed the "signatory operators," the SSA was merely following the directives of 26 U.S.C. § 9706(a) when it assigned the beneficiaries to operators who had employed the beneficiaries the next longest. Id. at 403–04 ("[The SSA] merely removed from the pool of possible contributors those

32

coal operators that could not constitutionally be required to contribute."). Likewise, in Sidney Coal Co. v. SSA, the Sixth Circuit reasoned that Eastern Enterprises merely "held that the SSA 'should never have assigned the retirees to Eastern in the first place'" and that "[a]fter determining that its Eastern-type assignments were 'invalid from the beginning,' the SSA began anew, assigning beneficiaries 'to comport with the terms of the statute as well as the Constitution.'" 427 F.3d at 347 (quoting Pittston, 368 F.3d at 403).

The courts also found no basis in the text of § 9706(a) for leaving the miners affected by Eastern Enterprises unassigned. Pittston held that "Section 9706(a) leaves unassigned only those retirees who were never employed by a signatory operator that was 'in business' at the enactment of the Coal Act." Pittston, 368 F.3d at 404 n.3. Similarly, Sidney remarked that the failure to assign a beneficiary to the responsible coal operator would shift beneficiaries into the "unassigned" category which is reserved "for those beneficiaries without any former employer still in business, so-called 'true orphans.'" Sidney, 427 F.3d at 349–50 (citing Peabody, 537 U.S. at 165–66). Meanwhile, assigning miners based on a newly defined group of eligible operators comports with legislative intent to minimize the number of unassigned beneficiaries. Pittston, 368 F.3d at 404; Sidney, 427 F.3d at 349.

We agree with the Fourth and Sixth Circuits that the SSA's approach to

33

assigning miners affected by <u>Eastern Enterprises</u> is reasonable and comports with both the Supreme Court's holding and with the legislative intent of the Coal Act.[14] Accordingly, we affirm the judgment of the district court in this regard.

## CONCLUSION

For the foregoing reasons, we **REVERSE** in part, **REMAND** in part, and **AFFIRM** in part the district court's grant of summary judgment to the SSA. We REVERSE the district court's judgment upholding the SSA's assignment to Appellants of Lee Jones and of the eleven miners at issue who were employed previously by Black Diamond. We REMAND for further consideration of the four miners whose employment with Black Diamond is disputed. We AFFIRM the remainder of the district court's grant of summary judgment to the SSA.

---

[14]Other courts have held similarly to <u>Pittston</u> and <u>Sidney</u>. <u>See</u> <u>Elgin Nat'l Indus., Inc. v. Barnhart</u>, No. 04-5243, 2005 U.S. App. LEXIS 7361, at *2 (D.C. Cir. Apr. 27, 2005) (stating that Appellant's "argument pertaining to the reassignment of beneficiaries after <u>Eastern Enterprises</u> is rejected for the reasons set forth in [<u>Pittston</u>]"); <u>Wheeling-Pittsburgh</u>, 229 F. Supp. 2d at 554 ("The Commissioner had the authority to reassign beneficiaries in response to . . . <u>Eastern Enterprises</u> and, thus, did not act in an arbitrary and capricious manner but, <u>rather</u>, acted within the bounds of the law.").